**AETNA INSURANCE COMPANY,**
Appellant,

v.

·**NEVILLE G. PENROSE, INC., and Eu-**
**nice Well Servicing Company,**
Appellees.

No. 19196.

United States Court of Appeals
Fifth Circuit.

June 22, 1962.
Rehearing Denied Sept. 19, 1962.

Vernon Coe and Thompson, Coe, Cousins & Irons, Dallas, Tex., for appellant.

Howard Barker, Fort Worth, Tex., Emil C. Rassman, Midland, Tex., Richard T. Churchill, Fort Worth, Tex., Thomas Black, John W. Stayton, Austin, Tex., Cantey, Hanger, Johnson, Scarborough & Gooch, Fort Worth, Tex., Black & Stayton, Austin, Tex., of counsel, for appellees.

Before TUTTLE, Chief Judge, and HUTCHESON, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Neville G. Penrose, Inc., owned and operated an oil well in Andrews County, Texas, where an unfortunate, and expensive, fire occurred December 15, 1956. Apparently the fire was caused by a blowout in a well that the Western Company of Midland, Texas, was servicing at the time. Penrose had hired Western to perform a sand fracturing operation at the well. Much of Western's equipment was destroyed. The Aetna Insurance Company reimbursed The Western Company for losses amounting to $196,500 and, as subrogee, brought this suit against Penrose and against the Eunice Well Servicing Company which had prepared the well for sand fracturing. Aetna asserted its right to recovery on the grounds that (1) Penrose in its contract with The Western Company agreed to reimburse the latter for any of its equipment that might be destroyed, (2) Penrose and Eunice were negligent in preparing the well for the sand fracturing operation, and (3) Penrose impliedly warranted that the conditions existing in the well would withstand the operations to be undertaken. The trial court struck the contract theory from the plaintiff's complaint and after trial directed a verdict for the defendants on the other two counts. Aetna appeals on all three counts and also on the ground that the trial court improperly restricted its opportunity to present rebuttal testimony. We reverse the action of the district court in striking out the allegation of contract liability and remand for a trial on that issue. We affirm the decisions below on

the questions of negligence, implied warranty, and exclusion of testimony.[1]

### I.

A fairly detailed recital of the sand fracturing operation is necessary for an understanding of the case.

The sand fracturing operation consisted of forcing a large quantity of mixed oil and sand down into the well under extremely high pressures. The Penrose well was approximately 4358 feet deep. The upper portion of the hole consisted of 8 and 5/8 inch casing which ran from the surface to a depth of 1620 feet. The lower portion was formed of 5 and 1/2 inch casing which started at a depth of 1565 feet and ran almost to the bottom of the well. The lower casing thus fitted within the upper casing for a distance of 55 feet at the point where the two met. In preparation for the sand fracturing operation Eunice placed in the well hole a 2 and 1/2 inch tubing running from the surface to a depth of 1890 feet. The process consisted of forcing the oil and sand through the tubing to the point where it opened into the 5 and 1/2 inch casing and then through the casing to the base of the well. To prevent the mixture from flowing upward in the circular space between the tubing and the casing a packer and hold-down were placed about thirty feet above the bottom of the tubing. The packer worked like a cork with a hole in its center. The tubing passed through the hole and allowed the mixture to move downwards, but the packer sealed off the space between the tubing and the casing and prevented the mixture from escaping upwards through that space. The hold-down was placed just above the packer; its function was to prevent the packer, which during the operation would be subjected to enormous pressure from the mixture below, from being itself forced upwards. The hold-down operated on a basis of pressure differential. When oil and sand were forced through the tubing, the pressure within the tubing (and within the hold-down) became greater than the pressure outside in the casing, since the packer below would prevent equalization. When the pressure differential reached a certain level cleats on the hold-down would push outwards and grab a hold onto the surrounding casing.

Before the Western Company began its operations, it tested the tubing and equipment in the well, by subjecting the casing below the packer to 2800 pounds of pressure per square inch while holding the pressure in the casing above at 100 pounds per square inch. The pressures remained steady and no leaks were revealed. Western then pumped 1500 gallons of oil containing 1500 pounds of sand into the well. The pressures in the tubing and in the casing below the packer rose to 4000 pounds per square inch, which was less than the 5000 pounds prescribed by Penrose as the maximum safe pressure; the pressure in the upper casing was held within the 800 pounds prescribed by Penrose. It appeared, however, that leakage was occurring into the upper casing, since it was necessary to "bleed" the casing to reduce the pressure there. The fracturing was successfully completed, and Western began to flush the tubing to remove sand from it. The pressures in the tubing and casing were 3600 pounds and 600 pounds. After five or six minutes of flushing, catastrophe struck. The hold-down tool lost its grip, and packer, hold-down, and tubing gave way together in retreat before the unresisted pressure in the casing. At the surface, the tubing rose three hundred feet into the air, and then toppled. As the tubing fell to the ground the gushing oil burst into fire, destroying among other things $196,446 worth of equip-

---

**1.** The exclusion of rebuttal evidence did not prejudice the plaintiff's case. A witness for the defendants testified that the fire started from a spray from a pipe for which The Western Company was responsible. In rebuttal the plaintiff asked to present a witness who had observed the fire and would testify that the tubing was moving up before the spray began. This matter is made irrelevant by our holding that the plaintiff's claim in negligence must be rejected for lack of evidence.

ment belonging to The Western Company. Having been forced up three hundred feet, the packer and tubing stopped; at that point the packer had been pushed out of the 5 and ½ inch casing and into the 8 and ⅝ inch casing, where the oil could escape around it without having to push it upwards. The tubing remaining in the well hole was pulled out the following day.

## II.

The plaintiff's complaint alleged "an oral contract" with Western Company "subject to printed conditions." The printed conditions were set forth in Western's catalogue and in field receipts. The complaint also alleged that "the quoted terms and conditions were part of general terms and conditions which were regularly published by the Western Company for its customers, including Neville G. Penrose, Inc. and the quoted terms and conditions were in effect continuously for a period of time at least from some date in 1955 to some date after December, 1956. Under the terms and conditions aforesaid, Defendant Neville G. Penrose, Inc. agreed to reimburse the Western Company of Midland for the value of tools or equipment lost in rendering the services contracted for and which were being performed by the Western Company at the time of the subject loss."

The subsidiary facts concerning these materials are undisputed. Western regularly gave to its customers a field receipt describing the work performed and it kept a copy of the receipt signed by an agent of the customer. The receipts were not executed until after the work had been done, and in this case the receipt involved was executed four days after the fire. The plaintiff asserts, however, that the same form of receipt had been used in many transactions between Penrose and Western during the previous two and one-half years, and that past experience created an understanding between the parties that became part of each subsequent contract. On the back of the receipt is printed:

"Conditions of Contract:

"All services are rendered subject to the items and conditions contained in the current price schedule of The Western Company. In part, these terms and conditions are as follows:
* * *

"3. Customer agrees that, should any of The Western Company's tools, instruments or equipment be lost or destroyed in the rendition of its service, customer will use all reasonable diligence and facilities available to recover the same, and to reimburse The Western Company for the reasonable value of any instruments, tools, or other personal property, that cannot be recovered, or for the cost of repairing any damaged items recovered."

Western also furnished a price catalogue that was circulated among its customers and allegedly governed the contract for the sand fracturing work that was being performed when the fire occurred. One of the terms stated in that catalogue was: "It is understood that customer will make diligent efforts to recover our instruments, tools or equipment lost in rendering our services, or reimburse us for their value. Customer further agrees to accept full responsibility for returning well to production."

The defendant attached to its motion for summary judgment on the contract claim a deposition by John Brown, an officer of The Western Company, stating in strong terms that it was the intention and practice of the company to interpret these provisions as covering only tools and equipment in the well and not general surface equipment.

On the basis of Brown's deposition and his own interpretation of the provisions, the trial judge struck the contract claim from the complaint. We believe that this action was premature. When an oral agreement indisputably has been integrated into a written contract, its interpretation devolves on the court. Teas v. Kimball, 5 Cir., 1958, 257 F.2d 817; United States v. American National

Bank of Jacksonville, 5 Cir., 1958, 255 F.2d 504; Hill & Combs v. First National Bank of San Angelo, Texas, 5 Cir., 1944, 139 F.2d 740. But when there is a dispute as to what was the agreement or whether a writing represents a term of the oral agreement, or when the writing is ambiguous, extrinsic evidence may be introduced to show what the real agreement was. That determination is one of fact and should be made by the jury. Haliburton Oil Well Cementing Co. v. Millican, 5 Cir., 1949, 171 F.2d 426; Hawkins v. Frick-Reid Supply Corporation, 5 Cir., 1946, 154 F.2d 88.[2]

 Here, there is uncertainty as to what was the oral agreement, uncertainty as to whether the catalogue or the receipt or both represented terms of the agreement, since neither was expressly signed by the parties prior to performance of the work, and no evidence of the effect on the agreement, if any, of trade practices or previous dealings between the parties. In making such a determination, evidence of the trade practices or of the customs in the industry and of the previous dealings between the parties is admissible. It may be noted that the provisions in the catalogue and those in the receipts are not identical, and that the catalogue does not support the plaintiff's claim, since it would render the customer liable *only* if the customer failed to make a diligent effort to recover lost equipment. The provision in the field receipt, however, is susceptible to an interpretation that would entitle the plaintiff to recovery. The plaintiff should be allowed a chance to show that such an interpretation was understood by the parties to be their agreement. This is a question of the parties' practice and understanding, and the plaintiff is not bound by John Brown's deposition on those questions. Plaintiff is entitled to present its side of the case, to show that Brown's testimony is inaccurate and that the parties actually had a different understanding. Until the plaintiff has had

this chance, the case is not ripe for summary judgment or a directed verdict. We remand the case to give the plaintiff a day in court on this issue.

### III.

 The plaintiff's negligence claim is based almost entirely on the testimony of John Evans, a consulting petroleum engineer who investigated this accident the day after the fire on behalf of the plaintiff to try to determine the cause of the fire and what could be done to prevent the reoccurrence of such fires. His testimony, however, seems to support the defendants about as much as it supports the plaintiffs.

Evans found that the packer, hold-down tool, and tubing pulled out of the well were in poor condition. He concluded that the cause of the fire was leakage which had lowered the pressure in the casing above the packer and reduced the holding power of the hold-down. His testimony throws light on the probable reasons for the accident, and in certain respects it is critical of the equipment and practice of the defendants. However, it does not provide anything more than a purely speculative basis for attributing the cause of the accident to negligence of the defendants.

Evans testified that the packer and hold-down tool, produced by the Guiberson Company, were not in his opinion as good as other makes of equipment available on the market. He recognized, however, that Guiberson equipment was in widespread use in the industry. Evans stated that when he examined the hold-down its buttons were "worn a little more than normally. They are normally sharp, and they were definitely worn. They were worn to the point that I would never have reused a hold-down tool in that condition." He said that the packer "was in a damaged condition when it was brought out of the hole. The lips were off the packer and so was the rubber element that affords the seal." As to both

---

2. For a discussion of whether an interpretation of a contract should be made by the court or the jury, see 3 Corbin on Contracts § 554 (1960).

tools, however, Evans's testimony indicates that the condition on inspection could be attributed entirely to their use. He said that the buttons on a hold-down normally are worn by use and must be replaced. With regard to the packer, he testified, "When you had normal use—when you actually use a packer the wear can be negligible or it can be severe. I witness both." Shortly after making his investigation, Evans made a written statement of his "Observations, Comments and Suggestions." This report stated: "The hydraulic hold-down tool did not show any unusual wear and I have many times witnessed more apparent wear to the hold-down buttons on operations where the hold-down did not show any apparent failure to hold at the surface." Evans also wrote in a letter to Western: "I believe that the packer and hydraulic hold-down tool failure was not due to defects in the tools themselves but was due to a down the hole condition for which the tools were never designed." This testimony, taken as a whole, provides no basis on which negligence could be found in the selection of the hold-down tool or packer that were used.

Evans stated that the tubing pulled to the surface was not tightly screwed together. "I see a lot of tubing pulled out of wells and this tubing was definitely loose. 2½ inch tubing isn't easily unscrewed. It is made up tightly. And in this case one man with a 36 inch wrench could easily unscrew it." Taking it as true that the tubing was loose when Evans examined it, the question remains as to why it was loose. The defendants assert that the tubing was loosened by the violent forces thrusting it upwards and by the rotation to which it was subjected during that movement. Evans's testimony does not negate this very plausible explanation. His evidence also indicates that it is normal for leaks to develop in the tubing while an oil and sand mixture is being forced through it. Evans expressed some disapproval of the method which he believed had been used to screw the lengths of tubing together. However, he was not present when that operation was performed, and his testimony does not prove that the method used was negligent. Witnesses for the defendants stated that the lengths were joined in a careful and effective manner; on the record, that testimony stands uncontradicted.

From the evidence it seems to be a wide open question as to what the ultimate cause of the accident really was. On the record, there is no evidence that the defendants failed to use due care in any of their operations. In his written report, Evans concluded: "The conditions under which this well was treated occur every day in the oil fields. *There was no evidence of negligence*, although the conditions were certainly far from perfect." (emphasis added.) The plaintiff's contention in this case parallels contentions equally speculative in a recent case before this Court. Fireman's Insurance Company of Newark, N. J. v. Robbins Coal Company, 5 Cir., 1962, 288 F.2d 349. In each case, accepting as true all of the testimony favorable to the plaintiff, all this would show would be the possibility of the accident having occurred according to the plaintiff's theory. Judge Tuttle, organ of the Court in the Robbins case, said:

"We are forced to the conclusion that if the jury accepted as true, as we must assume it did, all of the testimony sworn to touching on observable facts, all this would show would be that the occurrence *could* have been caused by a slide. We do not think that all of such proof warrants the conclusion that it *did* so occur, since from the same proof the occurrence can, with equal probability, be attributed to other causes. As stated in the Alabama case, Griffin Lumber Co. v. Harper [247 Ala. 616, 25 So.2d 505], supra, 'the evidence, it is without selective application to either of the theories of causation, and, therefore, they remain conjectures only.'

"It follows, therefore, that at the conclusion of the presentation of evi-

dence, the defendant was entitled to a directed verdict."

We hold that the plaintiff has not introduced evidence adequate to take the accident out of the realm of pure conjecture; there is not a sufficient showing of negligence as a cause of the accident to justify submission of the issue of negligence to the jury.

■■ As an alternative contention, the plaintiff seeks to base its negligence claim on the doctrine of *res ipsa loquitur*. We think it plain that that doctrine is inapplicable here. It permits an inference of negligence only in situations where an accident usually would not have occurred in the absence of negligence. Prosser on Torts § 42 (1955). Oil drilling operations contrast sharply with such situations in that they involve unavoidable hazards that often lead to accidents although no one has been negligent. The record in this case amply demonstrates this fact. Evans's purpose was to learn about oil well accidents so that more could be done to prevent their occurrence. Western's field receipt, on which the plaintiff has based its contractual claim to recovery, itself states: "because of the uncertain and unknown conditions, and the hazards existing in connection with the rendering of The Western Company's service and because of the physical conditions existing in an oil or gas well, not subject to control of The Western Company, The Western Company does not guarantee the results of its service." Similarly, Western's price catalogue states that "as there are so many conditions in and around wells which are unknown, uncertain or not subject to our control, we can neither guarantee the results of our services, nor be liable * * *." The existence of inevitable danger in oil well work, thus acknowledged by Western, not only renders *res ipsa loquitur* inapplicable but also illustrates with striking force why it would be pure speculation to attribute the accident here involved to the negligence of the defendants on the tenuous base of evidence present in the record.

### IV.

■ The plaintiff's argument for recovery on the basis of implied warranty is completely without merit. The plaintiffs refer to the basic principle of tort law that a property owner owes a duty to a business invitee to "take reasonable care to discover the actual condition of the premises and either make them safe or warn him of dangerous conditions." Restatement, Torts § 343 (1934). Thacker v. J. C. Penney Co., 5 Cir., 1958, 254 F.2d 672, cert. denied, 358 U.S. 820, 79 S.Ct. 31, 3 L.Ed.2d 61. From this misplaced springboard, the plaintiff attempts an impossible double gainer to show that the defendant Penrose impliedly warranted that no accident would befall the plaintiff during the sand fracturing operation. Its argument would extend the duty of reasonable care to an absolute liability. There is no precedent for such a result, and it is not open to this Court to consider such a drastic revision of long settled laws. The plaintiff has not attempted to show any evidence of negligence by the defendant in keeping up its premises or warning the plaintiff of known or discoverable dangers. Its contention for recovery on an implied warranty must be rejected.

The judgment below is affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion. Specifically, the judgment is affirmed insofar as it bears on the defendant's liability for negligence and for implied warranty. The judgment is reversed insofar as it bears on the plaintiff's alleged right to recover on contract; the order of the district court striking the allegations in paragraph vi of the complaint is vacated and set aside; the case is remanded for trial with instructions that the plaintiff be afforded a full oportunity to develop evidence in support of the defendant's liability in contract.