Jack **MEYERS**, Plaintiff-Appellant,

v.

The **SELZNICK COMPANY**, Inc., Defendant-Appellee.

No. 118, Docket 30550.

United States Court of Appeals Second Circuit.

Argued Nov. 1, 1966.

Decided Dec. 19, 1966.

Louis A. Tepper, Gainsburg, Gottlieb, Levitan & Cole, New York City (Emanuel Baetich, New York City, of counsel), for plaintiff-appellant.

Barry Brannen, Beverly Hills, Cal., Weissberger & Frosch, New York City (Elliot J. Lefkowitz, New York City, of counsel), for defendant-appellee.

Before FRIENDLY, SMITH and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

Appellant Meyers, a citizen of New York, brought this action in the District Court for the Southern District of New York against The Selznick Company, Inc., a California corporation, to recover on express contract or in quantum meruit a finder's fee on transactions by the defendant with one Sig Shore or his interests respecting two of defendant's motion pictures, Duel in the Sun and Ruby Gentry, for television broadcasting. The action was tried to a jury but the judge granted a motion by the defendant for a directed verdict and dismissed the complaint.

Early in 1962 Meyers ascertained from the late David O. Selznick, president of the defendant, that it had available for distribution to television stations a library of 19 motion pictures, all but two of which, Duel in the Sun and Ruby Gentry, had been previously shown. According to Meyers, Selznick fixed prices of $20,000 for a three-year and $25,000

for a five-year license on the reissued films and a total of $500,000 for the initial presentations of Duel in the Sun and Ruby Gentry, and authorized Meyers to represent his company on "the usual 10% commission basis." After various unsuccessful efforts at distributing the pictures, Meyers in New York telephoned Selznick in California on July 5; he inquired whether the films were still available, said he had "a very, very good prospect" in Sig Shore of Video Artists, reconfirmed the prices, and elicited from Selznick a promise that "my commission would be 10% of whatever money accrued to him as a result of any deal with Shore." A few days later he wrote Selznick about a meeting with Shore, who was about to go to California to see Selznick; the letter contained a postscript:

"P.S. Confirming our phone conversation that any deal concluded with Shore and or his interests is commissionable to me on the basis of ten per cent of the deal."

After various conversations between Shore and Selznick in California and Shore and Meyers in New York, Selznick telegraphed Meyers on July 27. He said the deal being negotiated with Shore, which was solely for the reissues, was much less advantageous than he had contemplated, and complained of Meyers' having exceeded his authority by offering Duel in the Sun and Ruby Gentry. The telegram continued:

"And in the event that there should be any deal for either or both of these pictures with Shore or anybody else, there will be no commission whatsoever. You have served thus far only to introduce us to each other by long distance. For this service and upon a waiver of all other claims, we are prepared to pay you five thousand dollars if and when this deal is consummated, but of course without paying you anything further on any other deals, if any, with Shore * * *. Please let me hear from you since we have no intention of closing even this deal with Shore, which as far as I am concerned,

is a severe disappointment, if there is going to be any nonsense about commissions beyond this amount * * *."

Meyers immediately responded with a telegram offering to cut his commission to 5%; Selznick by reply wire rejected that offer.

That same day Meyers telephoned Selznick. According to his testimony, he protested about Selznick's "endeavoring to write me out of the deal on Duel and Gentry," whereupon Selznick told him to forget about those films since Selznick didn't think he was going to make a deal for them with Shore whose price had not come up to expectations, and urged him to "go along" on the theory that Meyers would "make it up on other deals." Meyers said he would go along "if it is understood we can do that," continuing "We'll make it up on other deals. Maybe you will compromise with Shore and make a deal with him. I'm willing. Maybe I'll get you a different buyer, I'll come up with half a million for the two pictures." Selznick allegedly assented.

The talk was swiftly followed by a telegram from Selznick, also on July 27, "to confirm your telephonic agreement on the limitation of your commission to five thousand dollars, as dealt with in my previous two telegrams." Receiving no answer Selznick telegraphed six days later:

"Deal almost concluded. Wire immediately your confirmation of commission arrangement as dealt with in my previous telegrams."

To this Meyers responded:

"Pursuant to our telephonic and telegraphic agreements I confirm our understanding my commissions to be Five Thousand Dollars."

Selznick's company thereupon entered into a license agreement with Harbor Productions, Inc., one of Shore's interests, relating to the 17 reissued pictures; in this Selznick agreed to pay Meyers "for service in connection with the licensing of the pictures hereunder * * * an agent's commission of $5,000.00, and no more." On September 17, in response to a request from Meyers, the company sent a check for $5,000, which Meyers later collected, containing an endorsement that:

"Endorser acknowledges payment in full of all commissions due him by payor."

Meyers telephoned Selznick in October as to the continued availability of Duel and Gentry, found that Selznick was still asking $500,000 for them, and introduced Selznick on the phone to an executive of Seven Arts Films. This led to a telegram from Selznick making clear that he was under no obligation to accept an offer from Seven Arts and that "there are many things unresolved, including your commission." Meanwhile Selznick had been negotiating as to the two pictures with Shore who, at his request, had made contacts with television stations and had furnished Selznick with estimates that the pictures could gross more than the $500,000 Selznick had sought for a license. On November 2 Selznick wired Meyers that the two pictures were no longer available for TV in the United States or Canada.

Later, Selznick's company entered into an agreement, dated December 4, engaging Shore as its representative for eleven months to negotiate for the distribution of the two pictures on television at prices comparable to those Shore had estimated in October, the company reserving the right to approve or reject any licensing contract submitted. Shore was to pay most of the sales expenses and was to be compensated on a sliding scale—3% if net receipts equalled $350,000, 5% if they equalled $400,000, and 10% if they exceeded $450,000. A month later The Selznick Company and Shore modified their arrangements, the primary motive apparently being an attempt to throw income for The Selznick Company into 1962. By an agreement dated back to December 27, 1962, The Selznick Company granted Video Artists, Inc., a company operated by Shore, a license for the two pictures with the right to sublicense to television stations in designated markets until April 1, 1963 or until the sublicenses provided

fees of $132,500, whichever was earlier. For this Video Artists, Inc. delivered a note for $120,000, payable only to the extent of the sublicense fees, and additionally agreed to pay The Selznick Company half of any sums payable under the sublicenses in excess of $120,000. At the same time The Selznick Company and Shore agreed that only payments on the $120,000 note should be considered as net receipts for computing Shore's compensation under the earlier agreement, and the company gave Shore a $10,500 advance.

As soon as Meyers learned that an arrangement in regard to the two pictures had been made between The Selznick Company and Shore, he wrote Selznick that he had been anticipating advice on that subject and payment of "an equitable brokerage and or finder's fee." When Selznick did not answer, Meyers wrote him again. Selznick then answered in an angry letter making the points that Meyers "had nothing whatsoever * * * to do with our *employing* Shore" as selling agent, that only this had been done, and that Meyers had argued against it. Further correspondence resulted only in repitition of this position by The Selznick Company's attorney. The Company's receipts from the television licensing of the two films fell somewhat short of $350,000.

The defenses to this action for a commission were that the arrangements with Shore and his company concerning the two pictures were not licenses and thus did not come within the understanding between Meyers and Selznick, and that in any event, by accepting the $5,000 payment on the initial Shore transaction on the terms stated, Meyers had released any claim for payment on the subsequent one. In response to the first defense Meyers pointed to the breadth of the language he claimed Selznick had used, viz., "whatever money accrued to him as a result of any deal with Shore," adduced evidence as to the wide variety of forms used by motion picture producers to obtain revenues from distributing films, and relied on Shore's testimony that his work with respect to the two films was that of a distributor. In answer to the second he stressed the telephone conversation of July 27 that had preceded the Selznick wire of that date and was incorporated by reference in Selznick's confirming telegram and in Meyers' reply of August 2; the statement in the Harbor Productions contract that the $5,000 was a commission "for service in connection with the licensing of the pictures hereunder"; Selznick's willingness to consider a commission if Meyers arranged a deal with Seven Arts; and the failure of Selznick and his lawyer to raise the claim of release when Meyers first demanded a fee with respect to the two films. In reply the defendant pointed to the many differences between a true license contract such as that with Harbor Productions for the 17 films and the arrangement with Shore, and relied on various admissions elicited in Meyers' cross-examination with respect to both defenses. The district judge concluded that the "deals" ultimately made with Shore and Video Arts concerning the two new pictures "were not included either in the expressed contract or any natural implication therefrom," and that even if these items were included, Meyers "waived this claim." Accordingly he directed a verdict for the defendant and dismissed the complaint. We believe these issues were for the jury.

■ The books are indeed studded with statements that "The construction of all *written instruments* belongs to the court." 9 Wigmore, Evidence § 2556 at 522 (3d ed. 1940); 4 Williston, Contracts § 616 at 649 (3d ed. 1961). If this really were an unvarying rule, there would seem to be no sound reason why it should not also apply to contracts that are partly written and partly oral or wholly oral, except for the possible impracticability in some cases of severing the jury's task in ascertaining what was said from the judge's in interpreting what was meant, see 3 Corbin on Contracts § 554 at 223 (2d ed. 1960)—although such a distinction has been drawn. See, e. g., Goddard v. Foster, 17 Wall. (84 U.S.) 123, 142, 21

L.Ed. 589 (1872); Hoffman v. American Mills Co., 288 F. 768, 772 (2 Cir.), cert. denied, 263 U.S. 701, 44 S.Ct. 6, 68 L.Ed. 514 (1923). However, the traditional formulation goes considerably beyond the authorities, at least for the federal courts.[1] In a case often cited in support of the orthodox view, Hamilton v. Liverpool & London and Globe Ins. Co., 136 U.S. 242, 255, 10 S.Ct. 945, 950, 34 L.Ed. 419 (1890), Mr. Justice Gray, in holding that in that case the question was solely for the court, was careful to point out that there the answer "did not depend in any degree * * * on oral testimony or extrinsic facts". And in Rankin v. Fidelity Insurance, Trust & Safe Deposit Co., 189 U.S. 242, 252–253, 23 S.Ct. 553, 557, 47 L.Ed. 792 (1903), the Court ruled that "Although the construction of written instruments is one for the court, where the case turns upon the proper conclusions to be drawn from a series of letters, particularly of a commercial character, taken in connection with other facts and circumstances, it is one which is properly referred to a jury." The Court there quoted language of Mr. Justice Story in William & James Brown & Co. v. McGran, 14 Pet. (39 U.S.) 479, 493, 10 L.Ed. 550 (1840), which remains illuminating:

> "But there certainly are cases, in which, from the different senses of the words used, or their obscure and indeterminate reference to unexplained circumstances, the true interpretation of the language may be left to the consideration of the jury, for the purpose of carrying into effect the real intention of the parties. This is especially applicable to cases of commercial correspondence, where the real objects, and intentions, and agreements of the parties, are often to be arrived at only by allusions to circumstances which are but imperfectly developed."

■ With the courts' growing appreciation of Professor Corbin's lesson that words are seldom so "plain and clear" as to exclude proof of surrounding circumstances and other extrinsic aids to interpretation, see 3 Corbin on Contracts § 542, the exception bids fair largely to swallow the supposed general rule. About all that is left of the latter, at least where parol evidence has been properly admitted, is that, save for contracts so technical or complex as to lie beyond a jury's comprehension, "If the meaning after taking the parol evidence, if any, into account is so clear that no reasonable man could reach more than one conclusion as to the meaning of the writing under the circumstances," 4 Williston, supra, § 616 at 661–62, the court will instruct the jury as to the proper interpretation in the light of its findings with respect to the parol evidence or, where the parol evidence is undisputed, will direct a verdict—just as it would do on any other question where the evidence would warrant only one result.

Whether determination of meaning be regarded as a question of fact, a question of law, or just itself,[2] reliance on the jury to resolve ambiguities in the light of extrinsic evidence seems quite as it should be, save where the form or subject-matter of a particular contract outruns a jury's competence; indeed, the old formulation may have rested to some extent on the

---

1. The relative function of judge and jury in contract interpretation in a suit in the federal courts is an issue of federal "procedural" law and is not governed by *Erie* considerations. Cf. Byrd v. Blue Ridge Elec. Co-op, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958).

2. Avoidance of the "fact"-"law" dichotomy is desirable since many considerations which favor a considerable role for the jury in determining meaning would not be applicable when the issue is the power of an appellate court to reverse the findings of a judge. The latter was the issue to which Judge L. Hand was speaking when he said, in Eddy v. Prudence Bonds Corp., 165 F.2d 157, 163 (2 Cir. 1947), cert. denied, Prudence Realization Corp. v. Eddy, 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1128 (1948), that "whatever the right description" of a judge's ascertainment of meaning, "such a finding is assailable as an ordinary finding of fact is not".

jurors' then illiteracy and inability to understand more than exceedingly simple terms.[3] A judge has no peculiar institutional competence to determine such issues as were here presented—whether, if Selznick made the promise attributed to him, this embraced the type of arrangement ultimately concluded for the two pictures, and whether if Meyers' version of the telephone talk of July 27 is credited, his acceptance of $5,000 was to satisfy his claim not only with respect to the 17 reissued films also in the event of a subsequent deal for the two new ones. Resolution of both issues may hinge in no small degree on notions of fairness— the very kind of decision laymen are ideally equipped to make.

Although all the federal cases may not be reconcilable, the clear weight of authority accords with sound principle in supporting the view we have articulated. In Hoffman v. American Mills Co., 288 F. 768, 772 (2 Cir. 1923), after first saying, "It is settled that the construction of written contracts whether embodied in a single instrument or in written correspondence, is a question of law for the court and not one of fact for the jury", this court went on to acknowledge that "While this is a general rule, it is likewise true that where the case turns upon proper conclusions to be drawn from a series of letters taken in connection with other facts and circumstances, it is one which may properly be left to the jury." More recently, in National Utilities Services, Inc. v. Whirlpool Corp., 325 F.2d 779 (2 Cir. 1963), we said that "The construction of a contract is for the court when its terms are unambiguous and there are no extrinsic facts to affect its construction." In two recent decisions the Fifth Circuit has disapproved the court's taking the interpretation of an ambiguous contract from the jury. United States for Use of Dixie Plumbing Supply Co. v. Taylor, 293 F.2d 717, 722 (1961); Dobson v. Masonite Corp., 359 F.2d 921 (1966). See also Aetna Ins. Co. v. Neville G. Penrose Co., 304 F.2d 612, 615–616 (5 Cir. 1962), and Atlas Trading Corp. v. S. H. Grossman, Inc., 169 F.2d 240, 245 (3 Cir. 1948). In another recent decision, Osborn v. Boeing Airplane Co., 309 F.2d 99, 103 (9 Cir. 1962), concerning the interpretation of an ambiguous expression in the Boeing Company's Suggestion Form, the court said that where "the existence and terms of a contract must be determined by drawing inferences of fact from all of the pertinent circumstances, and the possible inferences are conflicting, the choice is for the jury."

■ The case should therefore have been submitted to the jury unless the evidence as to either of the defenses was "so clear that no reasonable man would determine the issue before the court in any way but one." 3 Corbin, supra, § 554 at 222–27; see 4 Williston, supra, § 616 at 661–63. The evidence did not meet that test. To be sure, if The Selznick Company had simply hired Shore as a salesman working out of its office, whether at a fixed fee or on a commission basis, the contract with Meyers could not reasonably be interpreted to cover the avails of his activity. But even the December 4 arrangement was more than that. It differed only in details, which a jury could find immaterial in the light of trade practices and the parties' intent, from a license whereby The Selznick Company was to receive 100% of the proceeds of sublicenses up to $350,000, with decreasing percentages if the collections exceeded that sum; and the company and Shore had no difficulty in partially converting it into that sort of contract when they chose to do so. A jury could rationally conclude that the kind of "deal" made with Shore—interestingly the very word by which the trial judge described it— was within what Selznick and Meyers meant when they used that term some months before. Similarly the release

---

3. See the discussion in a valuable forthcoming article by Professor Stephen A. Weiner, The Civil Jury Trial and the Law-Fact Distinction, 54 Calif.L.Rev. 1867 (1966); and 4 Williston, supra, § 616 at 649.

transaction was not so unambiguous as the defendant asserted. According to Meyers, Selznick indicated during the telephone talk that a sale of the two pictures to Shore was unlikely but Meyers voiced the hope that perhaps one might be made; a jury could rationally find that he would not have expressed that hope unless he expected to get something if it were. In his confirming telegram of August 2 he was at some pains to incorporate the telephonic as well as the telegraphic communications, and his endorsement of the $5,000 check can be read as acknowledging only that this was all to which he was then entitled. While there is little doubt that Selznick tried hard to shake loose of Meyers as to any further dealings with Shore, a jury could rationally conclude he did not succeed.

The judgment is reversed and the cause remanded for a new trial consistent with this opinion.[4]

4. This disposition makes it unnecessary now to pass upon plaintiff's complaint that the court allowed defendant the cost of depositions not used; since Judge Levet did not order the taxing of deposition costs regardless of the outcome, these must be held in abeyance pending the new trial.