HARDWARE MUT. INS. CO. OF MINNE-
SOTA v. JACOB HIEB, Inc.

No. 12866.

Circuit Court of Appeals, Eighth Circuit.

Jan. 8, 1945.

Holton Davenport, of Sioux Falls, S. D.
(Ellsworth E. Evans and Louis R. Hur-
witz, both of Sioux Falls, S. D., on the
brief), for appellant.

B. O. Stordahl, of Sioux Falls, S. D., and Alan Bogue, of Vermillion, S. D. (Roy E. Willy and R. G. May, both of Sioux Falls, S. D., on the brief), for appellee.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

GARDNER, Circuit Judge.

This was an action brought by appellee as plaintiff to recover from appellant as defendant damages caused by the destruction of property by fire, the property being covered by three separate insurance policies issued by the appellant insurance company. The parties will be referred to as they appeared in the trial court.

The complaint was in conventional form; alleged the issuance of the three insurance policies by the defendant, the payment of premiums, the total destruction by fire of the property insured, the furnishing of proof of loss by plaintiff, and the refusal of defendant to make payment. Defendant admitted the issuance of the policies, the occurrence of the fire, the total destruction of the property covered by the policies, the furnishing of proper proof of loss, and the refusal of defendant to make payment. By way of affirmative defenses it pleaded that the title of plaintiff to the property covered by the insurance policies was other than that of sole and unconditional ownership; that plaintiff did not in fee simple own the lots upon which the structures and personal property covered by the insurance policies were located, and that the fire causing the loss or destruction of the property was not an accidental fire but was a fire which was started or caused to be started by some of the officers or stockholders of the plaintiff corporation.

At the close of all the testimony defendant moved for a directed verdict on the ground that it appeared from the undisputed evidence that the interest of the plaintiff in the property covered by the insurance policies was not unconditional and sole ownership, which motion was denied, and the court submitted the case to the jury upon instructions to which defendant saved certain exceptions. The jury returned a verdict for plaintiff on all the issues, assessing its damages at $32,340, plus interest of $1,660, or a total of $34,000. The court denied defendant's motion for judgment, notwithstanding the verdict, and entered judgment for plaintiff upon the verdict, including a provision for $1,500 to plaintiff for attorney fees to be taxed as part of the costs.

From the judgment so entered defendant prosecutes this appeal, seeking reversal on substantially the following grounds: (1) That defendant was entitled to a directed verdict for violation of the "unconditional and sole ownership" clause contained in each of the three policies involved; (2) errors in instructions to the jury; (3) error in taxing $1,500 as attorney fees.

Each of the policies contained provision that, "This entire policy, unless otherwise provided by agreement endorsed hereon or added hereto, shall be void * * * if the interest of the insured be other than unconditional and sole ownership."

The property involved, both real and personal, had originally belonged to Jacob Hieb, Sr., who died November 26, 1933. By will duly admitted to probate he left substantially all his property to members of his family. Without completion of the probate of the Hieb estate, the heirs and devisees made conveyance and transfers of the buildings and contents to the plaintiff corporation, which thereafter assumed exclusive possession and control and conducted the business.

The statutes of South Dakota provide that title to a decedent's property, both real and personal, vests immediately on his death in his heirs or devisees, subject to a qualified right in the personal representative for purposes of administration and subject to rights of creditors of decedent. Thomas v. Morristown State Bank, 53 S.D. 499, 221 N.W. 257.

The trial court sustained defendant's contention that while plaintiff had an insurable interest in the property, the interest or title was not unconditional and sole because the estate was still in probate and the property subject to the rights of creditors. In denying defendant's motion for a directed verdict, the court held that under the evidence the question was presented whether the facts were such as to estop defendant from asserting this defense. The court instructed the jury that if before the issuance of the insurance policies, defendant's soliciting agent who countersigned the policies had been truthfully and honestly informed of the facts with reference to plaintiff's title, that it would be estopped to question plaintiff's unconditional and sole ownership. Defendant here concedes that the instruction in this regard properly stated the ap-

plicable law as determined by the Supreme Court of South Dakota (Farmers' State Bank of Parker v. Tri-State Mutual Grain Dealers' Fire Ins. Co., 41 S.D. 398, 170 N.W. 638; Peet v. Dakota Fire & Marine Ins. Co., 1 S.D. 462, 47 N.W. 532; Hight v. Maryland Ins. Co., S.D. 10 N.W.2d 285), but it contends that the evidence was insufficient to justify submission of that question to the jury; hence, it says there should have been a directed verdict.

O. M. Carlson, who signed each of the policies as agent for the defendant, was defendant's soliciting agent with full power to countersign policies. He was not called as a witness so that we have only Mr. Hieb's version of what negotiations were had between plaintiff and Mr. Carlson relative to plaintiff's title prior to the issuance of the policies. The court instructed the jury relative to the conversation had between Mr. Hieb and Mr. Carlson as follows: " * * * it is for you to determine just what that conversation was; just what knowledge Mr. Hieb conveyed to Mr. Carlson; whether or not Mr. Hieb did consciously or unconsciously misstate the facts and convey the wrong impression as to the title and ownership of this property to Mr. Carlson."

The court further instructed on this question as follows: "And also that an insurance company in soliciting or negotiating for the issuance and delivery of the insurance contract or policy is bound, under the law, to make inquiry as to the precise condition of the title of the insured in or to the property sought to be covered by the policy of insurance, and the failure of the company to make such inquiry would estop them from asserting any defect in title as a defense against a suit for recovery under the policy."

No exception was taken to this instruction, and it may therefore be accepted as stating the law of the case. There is a total absence of any evidence of any inquiry made by Mr. Carlson or anyone else representing defendant as to the title. In Farmers' State Bank of Parker v. Tri-State Mutual Grain Dealers' Fire Ins. Co., supra, the Supreme Court of South Dakota, answering the contention that there was no legal transfer of the property to the insured, and hence the insured had no insurable interest, said [41 S.D. 398, 170 N.W. 639]:

"Where a person is in the sole possession, control, and enjoyment of personal property, claiming to be the absolute owner thereof, a prima facie case of ownership is made out. It is not claimed that there was any concealment or attempted fraud practiced by Meier in procuring the policy. Appellant made no inquiries touching the condition of the title to the insured property, nor is it claimed that the condition of the title in any manner involved or increased the hazard, either moral or actual.

"It is the recognized rule of law that, where an insurance company insures property without inquiring into the precise state of title to such property before issuing the policy, it waives the ownership clause in the policy. This, of course, does not mean that a person who has no right or title to property may insure it as his own, and then collect the insurance in case of its destruction by fire. Such transaction would be void as against public policy, but a perfect legal title is not essential. Where the insured has a beneficial or equitable interest in the property, he may enforce an insurance contract, notwithstanding the ownership clause therein."

Jacob Hieb, Jr., was the manager of Jacob Hieb, Inc. He was executor under the will of Jacob Hieb, Sr., and he was one of the heirs and devisees of Jacob Hieb, Sr. In his first annual report to the County Court he reported a summary of the store business and apparently adopted the corporation business as a part of the estate business. There was no actual conveyance of the property by the executor to the corporation. Its title was dependent upon deeds and bills of sale executed by the heirs and devisees. As has been observed, the trial court submitted the case to the jury on the theory that plaintiff did not have such sole and unconditional ownership as was required by the policies, but based plaintiff's right to recovery, if any, upon estoppel or waiver. Mr. Hieb testified that he had a conference with Mr. Carlson after the death of Jacob Hieb, Sr., before January 6, 1934, when the corporate books were opened. He testified that at that time he told Mr. Carlson that it was his father's wish that the business be continued; that the heirs would continue the business by organization of the corporation; that his father's will had left the property to the children; that after conference among the children it was decided to incorporate the business and to continue the store in the name of Jacob Hieb, Inc., and that the heirs would be the

owners of all the stock. He was then asked:

"Q. Was there any other discussion at that time between you and Mr. Carlson with reference to the estate which your father had left? A. Yes, I told him exactly what the condition of everything was.

"Q. You say you told him the condition. Tell the jury just what you told him. A. I told him there was, according to the court records, or what my records were that we had filed with the court, there was a valuation of $120,000.00, and indebtedness of around $90,000.00."

Continuing, Mr. Hieb said that "later on" Mr. Carlson called again, and:

"I told Mr. Carlson it was the intention that the business be run the same as it had in the past, only in the name of Jacob Hieb corporation. That all of us children were the stockholders in this corporation, running this business with the intention of paying off all of the indebtedness, and that I asked him to handle this insurance the same as he had in the past, take care of all these policies."

"Q. For the purpose of refreshing your recollection, in this or in any of these conversations, was any statement made by you to him with reference to any deed or bill of sale which had been or was to be executed by you and the other children to the corporation? A. Yes.

"Q. As near as you can, in your own language, Jake, tell the jury what you told Mr. Carlson about what you and the children either had done or were going to do about executing a deed or bill of sale to the corporation. A. Well, I told him what procedure we had gone through. That we were incorporating this business, and that we had deeded all of our equities from the heirs to the corporation; that we had made a bill of sale out for all of these properties, and that they had been signed by Lydia and me and had been forwarded to John and Herbert for signing, and also Henrietta. * * *

"Q. When you had this conversation with Mr. Carlson, in which you have related the fact with reference to this deed and bill of sale, was that before or after this deed had been sent to John for signature? A. It was before it was sent to him.

"Q. And after you received the deed back from your brothers or sisters and placed it in your vault, did you ever at any

time after that discuss the matter with Mr. Carlson? A. Yes, I did.

"Q. What did you tell him then? A. Well, you know, we did not get out— * * * I told Mr. Carlson what we had done in regard to it.

"Q. Just tell the jury as near as you can recollect what you told Mr. Carlson about that deed and bill of sale. A. Well, that is what I told him, that we had made a contract for the heirs' equity, taking that property, and that we had deeded it over to the corporation.

"Q. Did you ever at any time, in any of your conversations with Mr. Carlson, tell him that you, as the executor of the estate of Jacob Hieb, deceased, had executed any deed to the corporation? A. I don't think I did."

There were certain statements made by the witness at a pre-trial hearing said to be inconsistent with the testimony given by him at the trial. This witness was a layman. In the pre-trial cross-examination he testified that, "The property had been transferred from the estate to the corporation." On the trial of the case he testified that deeds had been made transferring the equities of all the heirs to the corporation. As a layman he may have erroneously concluded as a matter of law that the transfers made by the heirs and devisees effected a transfer of the property on behalf of the estate. Mr. Carlson, defendant's agent, made no claim that he was misled or misinformed as to the character of the title which the corporation acquired. At most the discrepancy in the statements made or the language used went to the credibility of the witness and this, of course, was a question for the jury. The jury having found for the plaintiff on the issue, we must assume that it believed that the testimony given by Mr. Hieb at the trial accurately reflected his conversation with defendant's agent Carlson, especially in view of the fact that defendant failed to call the witness Carlson to give his version of the conversation. Carlson, as agent for the defendant, had written policies of insurance on substantially this same property when it was owned by Jacob Hieb. He knew of Jacob Hieb's death, and as a matter of law he knew there had been a change in ownership. He knew that plaintiff was in the exclusive possession of the property, claiming ownership. He knew that if any transfer had been made by the executor that fact would

be reflected in the records of the County Court. What reasonable inquiry would have disclosed, he must be held to have known. We think the plaintiff was entitled to go to the jury on the issue and that the jury's determination in favor of the plaintiff is sustained by substantial evidence.

■■ It is next contended that the court erred in refusing defendant's requested instruction to the effect that the pre-trial evidence of Jacob Hieb, Jr., could be considered in determining what was said between Jacob Hieb, Jr., and Mr. Carlson, and that if there appeared conflict between Mr. Hieb's pre-trial testimony and that given at the trial, the jury was not bound to accept either as against the other, but might consider both. The court instructed the jury that it should determine from all the evidence just what the conversation between Mr. Hieb and Mr. Carlson was, and whether Mr. Hieb misstated the facts relative to the title or ownership of the property. The court also instructed the jury that they were the sole judges of the credibility of the witnesses who had testified and the weight which should be given to their evidence; that in judging the credibility of the witnesses and the weight which should be given to their evidence, it was proper to take into consideration the interest, if any, which the witness might have in the outcome of the action or his relationship to any of the interested parties; the opportunity that the witness had had to know the truth as to the matter concerning which he testified, the reasonableness of his testimony, his manner of testifying, whether or not his story had the earmarks of truth, and whether it dovetailed in with the rest of the credible testimony in the case, and "All of these things, or anything else, Gentlemen, which in your judgment affects the credibility of the witnesses or the weight which should be given to his or her testimony, it is proper for you to take into consideration."

Referring to any conflict in the testimony, the court instructed the jury that: "If after weighing the matter carefully, viewing it in the light of your best judgment as reasonable men, you find that you are unable to reconcile the conflict upon any reasonable theory consistent with an intention on the part of each of the witnesses to testify truthfully, then it is for you to say who has been mistaken; who has told the truth; who has testified falsely; who you will believe. And if you

find in this case that any witness has gone onto the witness stand and knowingly testified falsely as to any material matter in the case, you are advised that you are at liberty to disregard all of the testimony of the witness so testifying."

We think the court fairly instructed the jury with reference to their duty in considering the credibility of the witnesses and the weight that might be given their testimony. The requested instruction called attention to particular parts of the testimony of the witness. This would tend unduly to emphasize this testimony and we think the court properly refused to give the requested instruction.

It was the claim of defendant that the fire which destroyed the property covered by the insurance policies was not an accidental fire but was by plaintiff's procurement. The evidence as to the origin or cause of the fire was wholly circumstantial. Based upon facts disclosed by the evidence and an examination and investigation made subsequent to the fire, expert witnesses called by the plaintiff expressed opinions that the fire was not a set fire. S. G. Mortimer, Deputy State Fire Marshal, testified among other things that it was his opinion that the fire was caused by the smoke pipe being so close to the joist. An expert witness, William B. Thomas, testified that in his opinion the fire was caused by a defective smoke pipe. Other expert witnesses testified in considerable detail, expressing the view that the fire was not a set fire, and explained what in their opinion caused the fire. Experts called by the defendant testified largely with reference to scientific theories or facts, and as to what in their opinion could have caused the fire.

Passing the question whether the testimony with reference to the origin of the fire was sufficient to raise an issue as to whether or not it had been wilfully started by or on behalf of the plaintiff, we shall consider the contention of the defendant that the court erred in its instructions on the question of incendiarism. As has been observed, the evidence on this issue was entirely circumstantial. In submitting the issue to the jury the court instructed as follows:

"Now, if that is a fact, and if you are satisfied from the evidence by a fair preponderance of the evidence that this was not an accidental fire, but that it was a fire that was started either by one of the

Hiebs or by some person at their instance and request, for the purpose of recovering under these policies and defrauding the company, then that would be a complete defense to this action and the plaintiff could not recover.

"That is an allegation of fraud and the burden of proof of fraud rests upon the person alleging it, so that the burden of establishing to your satisfaction, by a fair preponderance of the evidence that this was not an accidental fire, but was an intentional and incendiary fire, rests upon the defendant company in this case. Now, in passing upon the question as to whether or not this was an accidental fire, it is proper for you to take into consideration all of the facts and circumstances disclosed by the evidence bearing upon that matter; it is proper for you to consider the question as to whether or not the plaintiff corporation and those interested in it would profit by a fire at that time; whether or not the property insured was of sufficient value so that a fire would be a loss to them. You should take into consideration all of the facts and circumstances and surroundings of the place immediately preceding the fire; the conduct of those in charge of the establishment at that time; whether or not there was anything out of the ordinary or peculiar in their attitude or actions, in their conduct that evening. You will also take into consideration their actions at the time of discovery, whether or not that was consistent with men who own property which was on fire, either in manner or their acts. All of these facts and circumstances it is proper for you to take into consideration in deciding as to whether or not this fire was an accidental fire or whether it was set by or at the instance of some of the Hiebs. The mere fact that you may not be able to determine, if that be a fact, from the evidence as to just how the fire started would be no reason for you to say, in itself, that that was proof that it was an incendiary fire. Before you can find that this fire was started by anyone interested in the plaintiff company as a stockholder or officer, or anyone at their instance, by a fair preponderance of the evidence, you should be firmly convinced that either one of the Hiebs or someone at their instance deliberately and intentionally set these buildings on fire."

This instruction was immediately followed by the instruction as to circumstantial evidence, in which the court gave an instruction embodying the rule applicable in criminal cases. It is urged that by advising the jury that they should be firmly convinced that either one of the Hiebs or someone at their instance deliberately set these buildings on fire, the court required the defendant to prove this defense by more than a mere preponderance of the evidence. Throughout the instructions the court advised the jury that only a fair preponderance of the evidence was required, and the court defined the term fair preponderance of the evidence as the greater weight of the evidence, the evidence which best satisfies as to the truth. The court doubtless had in mind what was required to constitute a preponderance of the evidence where the issue was one of fraud, or where the issue was one as to whether a crime had been committed. There is, of course, a presumption of innocence prevailing even in civil actions and a like presumption that a party has not been guilty of fraud. Courts have generally held that to sustain a charge of fraud the evidence should be clear and convincing. M. E. Smith & Co. v. Kimble, 38 S.D. 511, 162 N.W. 162; Northwestern Mutual Life Ins. Co. v. Nelson, 103 U. S. 544, 26 L.Ed. 436; Houghton v. Burden, 228 U.S. 161, 33 S.Ct. 491, 57 L.Ed. 780; Donahue v. Mutual Life Ins. Co., 37 N.D. 203, 164 N.W. 50, L.R.A.1918A, 300; Fouts v. Nance, 55 Okl. 266, 155 P. 610, L.R.A.1916E, 283; Johnson v. Feskens, Or., 146 Or. 657, 31 P.2d 667, 107 A.L.R. 340. The requirement of clear and convincing proof is simply a requirement that the preponderance be definite, clear and convincing, and that the issue must be clearly established by a preponderance of the evidence. The instruction excepted to does not go to the extent of declaring that the proof must be beyond a reasonable doubt. The court consistently throughout the instructions advised the jury that a fair preponderance of the evidence was all that was required to establish any fact in issue. Some courts have gone so far as to hold that where in a civil case a crime is charged, the facts constituting the crime must be proved beyond a reasonable doubt. This court has held to the contrary. New York Acc. Ins. Co. v. Clayton, 59 F. 559. It is incumbent upon this court now, however, to follow the South Dakota rule, if that can be determined. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188,

114 A.L.R. 1487. The Supreme Court of South Dakota seems not directly to have passed upon the question, but it has, in Erickson v. Todd, 62 S.D. 280, 252 N.W. 879, held that the rule as to circumstantial evidence which prevails in criminal cases is also applicable in civil cases. We do not think the instruction, read in connection with all of the other instructions, is susceptible of the construction contended for by appellant. It in effect defined the character of evidence required to constitute a preponderance on this issue.

In view of our conclusion on this phase of the case, exception to the refusal of the court to give defendant's requested instructions said to clarify the nature of the proof required to establish defendant's claim of incendiarism, need not be further considered. We have given careful consideration to the other contentions of defendant with reference to the instructions given and refused, and are of the view that they are without merit.

 It is finally urged that the court erred in allowing plaintiff $1,500 as attorney fees to be taxed as costs. Section 31.2213 of the South Dakota Code of 1939 provides that whenever any policy of insurance covering real estate and insuring against loss by fire, tornado or lightning is sued upon, the amount of insurance written in the policy shall be taken conclusively as the true value of the property insured and the amount of loss and measure of damages if the property is wholly destroyed. It is then provided that, " * * * and the court, upon rendering judgment against the insurance company upon any such policy of insurance, shall allow the plaintiff a reasonable attorney fee, to be taxed as a part of the costs."

There is no claim that the allowance here is unreasonable or excessive, but it is claimed that it is in the nature of a penalty and its enforcement would be violative of the due process of law and equal protection of the law clauses of the Constitution. The Supreme Court of South Dakota, in Hight v. Maryland Ins. Co., 10 N.W.2d 285, 288, referring to this statute, said: "Having held earlier in this opinion that the policy of insurance, issued by the appellant to the respondent, was a valid policy under SDC 31.2213, it necessarily follows that the court, pursuant to the terms of said statute, was justified in allowing the respondent a reasonable attorney fee to be taxed as part of the costs. The amount found by the trial court seems reasonable and will, therefore, not be disturbed."

This statute had been adopted and was in effect long before and at the time the policies here involved were issued. Inter-Southern Life Ins. Co. v. McElroy, 8 Cir., 38 F.2d 557, and Standard Accident Ins. Co. v. Rossi, 8 Cir., 35 F.2d 667, are relied on by appellant as supporting its contention that this statute as applied to the facts in this case is violative of the Federal Constitution. Since the decision of those cases, however, the Supreme Court of the United States, in Life & Casualty Ins. Co. v. McCray, 291 U.S. 566, 54 S.Ct. 482, 483, 78 L.Ed. 987, seems to have put at rest this question and specifically disapproved the decisions relied upon by appellant. In that case it appeared that the Supreme Court of Arkansas had sustained the recovery of attorney fees in addition to the amount due on a policy of life insurance. It was contended that the statute authorizing the allowance of such attorney fees was violative of the Fourteenth Amendment. In the course of the opinion, the late Justice Cardozo, speaking for the court, among other things, said:

"The Fourteenth Amendment does not prohibit the award of an attorney's fee, moderate in amount, when payment of a policy of life insurance has been wrongfully refused.

"We assume in accordance with the assumption of the court below that payment was resisted in good faith and upon reasonable grounds. Even so, the unsuccessful defendant must pay the adversary's costs, and costs in the discretion of the lawmakers may include the fees of an attorney. There are systems of procedure neither arbitrary nor unenlightened, and of a stock akin to ours, in which submission to such a burden is the normal lot of the defeated litigant, whether plaintiff or defendant. The taxing master in the English courts may allow the charges of the barrister as well as the fees of the solicitor. Nothing in the Fourteenth Amendment forbids a like procedure here. * * * Nor is there an unjust discrimination, an arbitrary denial of the equal protection of the laws, in laying the burden on insurers and not on all defendants. Diversity of treatment in respect of the costs of litigation has its origin and

454

warrant in diversity of social needs. Dohany v. Rogers [281 U.S. 362, 50 S.Ct. 299, 74 L.Ed. 904, 68 A.L.R. 434]. Dependents left without a breadwinner will be exposed to sore distress if life insurance payments are extracted slowly and painfully, after costly contests in the courts. Health and accident insurance will often be the sources from which the sick and the disabled are to meet their weekly bills. Fire insurance moneys, if withheld, may leave the business man or the householder without an office or a home. Classification prompted by these needs is not tyrannical or arbitrary."

This decision is, of course, controlling here. Being of the view that there were no prejudicial errors committed by the trial court, the judgment appealed from is affirmed.