WESTERN INDUSTRIES, INC., Plaintiff-Appellee, Cross-Appellant,

v.

NEWCOR CANADA LIMITED, Defendant-Appellant, Cross-Appellee.

Nos. 83–2163, 83–2197.

United States Court of Appeals, Seventh Circuit.

Argued March 27, 1984.

Decided July 11, 1984.

As Corrected July 13, 1984.

John S. Skilton, Foley & Lardner, Milwaukee, Wis., for plaintiff-appellee/cross-appellant.

Keith F. Bode, Jenner & Block, Chicago, Ill., for defendant-appellant/cross-appellee.

Before PELL, CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

Western Industries purchased several custom-built welding machines from Newcor Canada for use in manufacturing microwave oven cavities. The machines did not work right and Western brought this breach of contract action against Newcor, basing federal jurisdiction on diversity of citizenship. Newcor counterclaimed for the unpaid portion of the purchase price of the machines. The jury awarded Western damages of $1.3 million dollars and Newcor about half that (the full unpaid balance of the purchase price of the machines) on its counterclaim. Separate judgments were entered on the two claims and both parties have appealed. The appeals raise a variety of interesting substantive and procedural issues, the former being controlled (the parties agree) by the law of Wisconsin, including the Uniform Commercial Code, which Wisconsin has adopted. See Wis. Stat. §§ 401.101 et seq.

The contract between Western and Newcor grew out of Western's contract with a Japanese manufacturer of microwave ovens, Sharp, to supply Sharp with cavities for microwave ovens. Sharp wanted Western to weld the cavities by a process known as projection welding, because that is how microwave oven cavities are made in Japan; and Western agreed. The projection method is not used in the United States to weld thin metal, such as the cavities of microwave ovens are made of; spot welding is the method used here. So when Western went to Newcor, a leading manufacturer of specialty welding machines, to explore the possibility of buying machines for use in fulfilling its contract with Sharp, it had to ask Newcor to design and build a type of welding machine that Newcor was unfamiliar with. Newcor agreed to do this, however, and after further discussions Western's director of engineering placed a purchase order by phone for eight machines with Newcor's sales engineer on May 17, 1979. According to the memoranda that both men made of the conversation, no specific terms other than the date of delivery were discussed; price was not discussed, for example. On May 23 Newcor delivered to Western a formal written quotation of terms for the sale. On the back of one page a number of standard contract terms were printed, including one disclaiming all liability for consequential damages. Western did not reply immediately, but in mid-July it sent Newcor a formal purchase order, mysteriously pre-dated to May 15, that included on the back a set of printed terms one of which stated that the buyer (Western) was entitled to general as well as special damages in the event of a breach of the seller's warranties. On July 20 Newcor sent Western an acknowledgement form stating, "In conformity with our conditions of sale appearing in [the written quotation of May 17] furnished to you by us, this approves and accepts your order." Western did not respond. The parties never discussed any of the printed terms contained in the contract forms that they had exchanged. Three machines were bought later through a similar exchange of forms.

The parties treat the sale of all 11 machines as one contract, as shall we.

The machines were built and delivered but turned out to be unusable for making microwave oven cavities. Newcor took the machines back and rebuilt them as spot welding machines, redelivering them to Western a year after the delivery date called for in the contract. As a result of the delay in getting machines that it could use, Western incurred unforeseen expenses in fulfilling its commitment to Sharp; for example, it had to manufacture cavities manually at much higher cost than it would have incurred if it had had proper machines. These expenses are the basis of its damage claim against Newcor.

Newcor's first ground of appeal is that the district judge improperly excluded evidence that the custom of the specialty welding machine trade is not to give a disappointed buyer his consequential damages but just to allow him either to return the machines and get his money back or (for example if the breach consists in delivering them late) keep the machines and get the purchase price reduced to compensate for the costs of delay. Whether every penny of the damages that Western is claiming comes within a strict definition of "consequential" damages is a question at once difficult, see, e.g., *Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1207–11 (6th Cir.1981), and inconsequential. Newcor contends that it is not liable for any damages above the purchase price, however those damages are described; and if this is right, then even if Newcor had a contract with Western that it broke it is not liable for any of the damages that Western was awarded.

■ Although trade custom or usage is a question of fact, see UCC § 1–205(2) and Official Comments 4 and 9; 7 Wigmore, Evidence in Trials at Common Law § 1954, at pp. 107–08 (Chadbourn ed. 1978), the district judge refused to allow Newcor's three principal witnesses on the existence of the alleged trade custom to testify, on the ground that they were incompetent to give such testimony; and having done this

the judge later instructed the jury that there was no issue of trade custom in the case. Two of the three witnesses whom Newcor wanted to call were experienced executives of companies that manufacture specialty welding machines (one of them was also the president of those manufacturers' trade association), and between them the two had almost 75 years of experience in selling such machines. The third witness was a former executive of Western and had long experience in buying such machines. These witnesses were prepared to testify that consequential damages were unheard of in their trade. When a machine did not work the manufacturer would spend his own money to fix it or would take it back and refund the purchase price to the buyer, but he would not compensate the buyer for the disruption to the buyer's business caused by the defect.

The district judge barred this testimony on a variety of grounds. He thought the testimony of one of the witnesses "had to be to some degree discounted" because he was an executive of Newcor. Another he thought was not competent to testify that the alleged trade custom was "pervasive" throughout the industry. The judge also indicated that he did not think testimony by either sellers or buyers very probative; he wanted testimony about both sides of the transaction at once—for example, such testimony as a broker might give. And he thought that the fact that the sellers had gotten together in their trade association and adopted a form contract disclaiming liability for consequential damages was evidence of merely a "unilateral" custom; there could be no custom of the trade unless buyers knew about the form and accepted it.

■ There are three ways of taking these comments. The first is that the district judge thought that even if the jury believed everything the witnesses said, Newcor would have failed to establish the existence of a trade custom because the witnesses were not prepared to testify to the existence of a custom known to and accepted by all sellers and all buyers. But

this would be too stringent a test of trade custom. It is not the law, for example, that the buyer must know of the custom; if he should have known, he is bound. See UCC § 1–205(3); Farnsworth, Contracts 511 (1982); and (for a defense of this principle on economic grounds) Warren, *Trade Usage and Parties in the Trade: An Economic Rationale for an Inflexible Rule*, 42 Pitt.L.Rev. 515, 581 (1981). Thus, what the judge called a "unilateral" custom could exonerate Newcor.

■ Another way to take the judge's comments, however, is that he thought the evidence these witnesses would have given lacked persuasive force. But so viewed his comments went to the weight rather than admissibility of Newcor's evidence of trade custom, and a judge in our system does not have the right to prevent evidence from getting to the jury merely because he does not think it deserves to be given much weight. See, e.g., *Joy Mfg. Co. v. Sola Basic Industries, Inc.*, 697 F.2d 104, 110–12 (3d Cir.1982). He may comment to the jury on the weight of the evidence (though few federal judges do that nowadays), and he may have to balance weight against prejudice in ruling on objections under Fed. R.Evid. 403, but he may not screen witnesses simply to decide whether their testimony is persuasive. The criticisms that the judge made of Newcor's trade-custom witnesses could have been put before the jury by Western in cross-examination if the witnesses had been allowed to testify. But a judge may not (with immaterial exceptions), by listening to cross-examination before the witnesses go before the jury, decide that the witnesses are unworthy of belief, and forbid them to testify.

■ Of course testimony of trade custom is testimony to a conclusion; and though all evidence, even eyewitness testimony, is inferential to a degree (see Hoffman, *The Interpretation of Visual Illusions*, Scientific American, Dec. 1983, at p. 154), the chain of inference is longer when the fact testified to is the existence of a trade custom than when it is the color of the defendant's hair. If the members of

this court had been called as witnesses in this case and asked whether it was the custom of the specialty welding machine trade not to give disappointed buyers consequential damages, we would not have been competent to answer. But Newcor's witnesses were experienced executives in the trade, and the existence of the alleged custom was a matter they could infer from their own observations and experience, since each had negotiated many sale contracts such as the one in issue in this case. Any doubt about the admissibility of their testimony is dispelled by section 701 of the Federal Rules of Evidence, which makes lay opinion evidence of the kind involved here admissible, see *Bohannon v. Pegelow*, 652 F.2d 729, 731–32 (7th Cir.1981), and by the fact that under the liberal definition of "expert witness" in Rule 702 all of these witnesses could readily have been qualified as expert witnesses on the question of trade custom. The Advisory Committee's Notes on Proposed Rule 702 state that "within the scope of the rule are ... the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."

Finally, the judge may have had in the back of his mind a line of Wisconsin cases, long predating the Uniform Commercial Code, which require that proof of trade usage be " 'clear and explicit.' " E.g., *Knobel v. J. Bartel Co.*, 176 Wis. 393, 398, 187 N.W. 188, 190 (1922) (quoting an 1856 case, *Power v. Kane*, 5 Wis. 265, 268). We can assume, without having to decide, that this standard expresses a substantive principle that, if it were still in force, would bind a federal court in a diversity suit. Cf. *Breeland v. Hide-A-Way Lake, Inc.*, 585 F.2d 716, 721 (5th Cir.1978); *Hardware Mutual Ins. Co. v. Jacob Hieb, Inc.*, 146 F.2d 447, 452 (8th Cir.1945). But it cannot be considered authoritative any longer, in view of the hospitable approach that the Code (enacted into Wisconsin law) takes to evidence of trade custom. See White & Summers, Handbook of the Law Under the Uniform Commercial Code 103 (1980) ("Code requirements for proof of trade us-

age are far less stringent" than common law requirements).

Although we are in no position to determine whether the custom alleged by Newcor actually exists, the hypothesis that it exists is certainly not so incredible that testimony on the subject could be excluded by analogy to the principle that excludes testimony in contradiction of the laws of nature. The relevant trade is the manufacture of a particular kind of custom-built machinery. A custom-built machine is quite likely either not to be delivered on time or not to work (not at first, anyway) when it is delivered; anyone who has ever had a house built for him knows the perils of custom design. If a custom-built machine is delivered late, or does not work as the buyer had hoped and expected it would, the buyer's business is quite likely to suffer, and may even be ruined; and as the buyers of these welding machines are substantial manufacturers to whose businesses the machines are essential, the potential costs of defective design or late delivery are astronomical.

The effect on a buyer's business of the seller's failure to make timely delivery of some critical input, such as the mill shaft in *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854), is a classic example of consequential damages. See, e.g., *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 955–58 (7th Cir.1982); *Mead Corp. v. McNally-Pittsburg Mfg. Corp., supra*, 654 F.2d at 1207–09. And the traditional rule of the common law, announced in *Hadley v. Baxendale*, was that consequential damages were not recoverable in contract cases unless specifically negotiated for. See *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 543, 23 S.Ct. 754, 755, 47 L.Ed. 1171 (1903). The rule has been relaxed and today most courts would say that it was enough if the consequences were foreseeable, whether or not there was evidence that the promisor had undertaken to insure the promisee against them. See, e.g., Farnsworth, *supra*, at 875, 880–81, 884–85, 887–88. Since the UCC adopts an especially liberal standard, we may assume that in the absence of an express disclaimer

of liability for consequential damages, or of a disclaimer inferrable from a trade custom, they would be recoverable here. See UCC §§ 2–713 to 2–715, and Official Comment 3 to 2–715. But all we need find in order to conclude that Newcor's evidence of trade custom was admissible is that a rational jury could have concluded that, yes, it was the custom for manufacturers of specialty welding machines not to be liable for consequential damages. That contractual liability for such damages (in the absence of special notice) is of relatively recent vintage, that many breaches of contract are (as here) involuntary, that only the sky would be the limit to the amount of consequential damages that manufacturers of machinery indispensable to their customers' businesses might run up, that those customers not only have a better idea of what the potential injury to them might be but also might be able to avert it more easily than their supplier—all these things make it not at all incredible that a custom might have evolved in this industry against a buyer's getting consequential damages in the event of a breach.

■ If there was such a custom, it would not take the manufacturers of specialty welding machines off the financial hook completely. When they have to take back and resell custom-built machines they face the prospect of a heavy loss. A machine custom-designed to one manufacturer's specifications may not fit any other's. That is no doubt why Newcor spent hundreds of thousands of dollars to rebuild these machines as spot-welding machines that Western could use. That is also why we reject Newcor's argument that Western should be estopped to claim damages because it induced Newcor to rebuild the machines. Newcor rebuilt them in its own interest, to mitigate the loss it would have incurred if it had had to take back the machines and refund the purchase price; if it had taken back the machines it would have had to rebuild them in order to be able to resell them.

But a disclaimer of liability for consequential damages would place *some* limit on the exposure of the manufacturers of specialty welding machines. It would also give buyers incentives to take their own precautions, which might be efficacious, against the disasters that might befall them if the machines did not work. See *Evra Corp. v. Swiss Bank Corp., supra,* 673 F.2d at 957–59. There was much evidence that Western made a serious mistake in agreeing with Sharp (rather casually as it appears) to build microwave oven cavities by projection welding, a process which, it turned out, American safety standards made infeasible. Western would have been less likely to make such mistakes if it had known with certainty that it would not be able to get consequential damages if the machines didn't work.

■ Thus far we have assumed, as did the district judge, that if the custom of the trade is that the buyer shall not receive consequential damages, it is a binding though silent term of the contract and overrides the provisions in the UCC that, in the absence of a contrary provision in the contract, make consequential damages normally an available remedy for breach of a sales contract. But Western contests this premise and argues that the district judge's exclusion of evidence of trade custom can be upheld on the ground that a trade custom cannot limit liability, because section 2–719(1)(b) of the Uniform Commercial Code provides that "resort to a remedy as provided [in the contract] is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." The cases, rightly in our view, reject this argument. See, e.g., *Transamerica Oil Corp. v. Lynes, Inc.,* 723 F.2d 758, 765–66 (10th Cir.1983); *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751, 756 (3d Cir.1976). All section 2–719(1)(b) does is to repeal the rule *expressio unius est exclusio alterius* as a rule of contract interpretation. That is, the fact that a contract specifies one remedy is not to be taken to exclude others. This is perfectly sensible but does not answer the question whether a particular remedy is excluded not because the parties did not mention it in the

contract but because the custom of the trade makes it unavailable.

Newcor has a second ground of appeal. It wanted to put before the jury not only the theory that trade custom had supplied a silent contractual term excluding liability for consequential damages, but also the theory that the explicit terms of the contract excluded such liability (though we shall see that these theories are not completely independent of each other). The terms are the disclaimer in the formal written quotation that Newcor sent Western on May 23 and the language in which on July 20 it acknowledged Western's inconsistent form. But the district court ruled that the contract was made on May 17 and that the disclaimer of May 23 was a material alteration of that contract and was therefore a nullity. Since the case must be tried again because of the erroneous exclusion of Newcor's evidence of trade custom, we must decide whether the judge's ruling on Newcor's alternative theory should be followed in the next round.

■ If the judge was right that a contract was made on May 17, his conclusion followed. For then Newcor's formal written quotation was merely a written confirmation, which under the UCC could not alter the oral contract materially. See UCC § 2–207(2)(b). Among the terms that could not be changed if the effect was to alter the oral contract materially would be terms that the UCC reads into contracts when they are silent on a question, including remedy terms, such as that which allows consequential damages. See UCC § 2–207, Official Comment 6. The deletion of a major remedy would be a material alteration. The fact that the disclaimer was repeated in a later confirmation (that of July 20) could make no difference.

■ Thus the question whether a contract was formed on May 17 was critical to Newcor's alternative theory; if it was formed then, the theory collapsed. The answer turned on whether the parties intended to make a contract then. See UCC § 2–204(3). This looks, of course, like a classic jury question; and though the interpretation of writings is traditionally the responsibility of the judge rather than the jury, tradition is no longer adhered to in contract cases such as the present where a series of mutually inconsistent writings must be put together with nondocumentary evidence to determine whether or when a contract was made. See *Meyers v. Selznick Co.*, 373 F.2d 218, 222–23 (2d Cir. 1966) (Friendly, J.); Restatement (Second) of Contracts § 212(2) (1981); Farnsworth, *supra*, at 516–17. Therefore the judge should not have taken the question when the contract was made from the jury unless no reasonable trier of fact could have found that it was made after May 17.

■ A reasonable jury could have found—we do not say it would have had to find—that the parties on May 17 had agreed that Newcor would sell projection-welding machines for delivery early in 1980 only if mutually acceptable terms covering the details of the agreement, including such important details as the price and the remedies for delay or other breach, could be worked out by the parties in subsequent negotiations, and only if Western—which planned a visit to Newcor's plant—was satisfied that Newcor could manufacture the machines on time (which, as it turned out, Newcor could not do). The jury, having so found, could have concluded that the parties did not intend to make a legally enforceable contract on May 17, because essential elements of the agreement were still too vague for the parties to want legal consequences to attach to an alleged breach. The jury might then have found that Newcor's May 23 written quotation, coupled with Newcor's July 20 acknowledgment reincorporating the terms of the May 23 quotation, followed by silence from Western, created an agreement to exclude consequential damages with respect to the eight machines initially ordered, and maybe also with respect to the three ordered subsequently through exchange of the same forms. The Code contains no presumption against such an exclusion, see section 2–207(3), provided reasonable remedies remain to the buyer if there is a breach; such

a presumption would not make sense in light of the liberality with which the Code allows the award of consequential damages. And Western's option to return the machines and get its money back was not a trivial remedy.

As a practical matter, however, Newcor's alternative theory is not very different from its main theory—that the custom of the trade excluded liability for consequential damages. Given an exchange of inconsistent forms, Newcor would have to present a reason why its form disclaiming liability for consequential damages should be accepted over Western's form asserting such liability; and the reason would have to be the custom of the trade, as that is the only substantial ground that Newcor has for claiming precedence for its disclaimer. So it may not be important whether the contract was made on May 17 and contained a silent term created by trade custom, or was made later and the parties accepted Newcor's disclaimer. We repeat that to show acceptance Newcor must convince the jury of the existence of the trade custom. But we think Newcor is entitled to argue to the jury if it wants that the contract came into existence after May 17.

■■■■ Western argues that even if the jury could, on whatever theory, have found that Newcor did not owe it consequential damages for breach of contract, Newcor would not be off the hook; the jury found Newcor negligent, and negligence is an independent basis for liability, unaffected by the plaintiff's contract rights. Sometimes the victim of wrongdoing may indeed sue in tort for an injury growing out of contract negotiations. See, e.g., *A/S Apothekernes Laboratorium v. I.M.C. Chem. Group, Inc.*, 725 F.2d 1140, 1142 (7th Cir.1984). For example, if Newcor had fraudulently induced Western to disclaim all right to consequential damages, Western could have sued Newcor for the tort of deceit as well as for breach of contract. Or if in the course of performing the contract Newcor had done some physical damage to Western's property, maybe by dropping one of the welding machines on the floor of West-

ern's plant during delivery, Western could have sued in tort. The right to be free from physical damage to one's property, like the right to be free from fraudulent inducements to contract, does not arise out of a contract. It is a right with which a person is endowed by property law and tort law. See, e.g., *Berwind Corp. v. Litton Industries, Inc.*, 532 F.2d 1, 6 (7th Cir. 1976) ("the negligence liability was based upon independent duties and not upon contractual duties"). But where the only right upon which the plaintiff sues is a right created by a contract, proof that the contract created the right is indispensable. See, e.g., *Gates Rubber Co. v. USM Corp.*, 508 F.2d 603, 616 (7th Cir.1975). Western has no tort right to the prompt delivery of nondefective machines that it orders. Its rights if any are based on its contract with the vendor. Before it can recover damages for negligence it must show that there was a breach of a contract that had been intended to protect it from the consequences of delayed delivery or defective construction.

■■■■ We turn now to Western's cross-appeal, where the main contention is that if we reverse the judgment in its favor we should also reverse the judgment in favor of Newcor on its counterclaim for the unpaid balance of the purchase price of the machines, and thus remand for a new trial on all issues. Newcor concedes as we have said that a possible remedy for its breach of contract would be a reduction in the purchase price. The jury, which awarded Newcor the whole of the unpaid balance, no doubt thought that since it was giving Western consequential damages there was no need to give Western in addition some abatement of the purchase price. That would be overcompensation, assuming as the jury must have done that its award of consequential damages was fully compensatory. If the jury should conclude in a new trial, as it may, that Western is not contractually entitled to consequential damages, it may then want to award Western an abatement of the purchase price in lieu of such damages. To enable the jury to

consider this possibility we must reverse the judgment on the counterclaim.

We add for the guidance of the parties and the judge on remand that should the jury again award both parties something on their claims, the district court should enter a single judgment netting out the opposing awards, rather than, as it did, two separate judgments. Cf. *First National Bank v. Master Auto Service Corp.*, 693 F.2d 308, 315 (4th Cir.1982). When separate judgments are entered and only one is challenged on appeal, the other has to be paid immediately even though it may turn out that the party obtaining that judgment really owes the other party more money. And this possibility makes it almost certain that there will be a cross-appeal to take advantage of the automatic stay provisions of Fed.R.Civ.P. 62(a) and 62(d). Thus, if a single judgment is entered, the appellate process is simplified.

The parties raise some other issues, which we have considered but find to have no merit. The judgment in favor of Western on its claim and the judgment in favor of Newcor on its counterclaim are reversed and the case is remanded for a new trial on both claims, with no costs in this court.

REVERSED AND REMANDED.

CUDAHY, Circuit Judge, concurring.

I agree with the majority that a limitation of remedy might have been accomplished by trade custom or usage and that the evidence of trade custom should probably have been admitted. However, the majority's discussion of the significance of the contract formation issue and its analysis of the "battle of the forms" is, I believe, novel in at least one particular. Thus, the majority seems to be saying that, if the contract was not formed during the May 17 phone conversation, then the question to be put to the jury is whether the existence of a trade custom which denies consequential damages serves to give precedence to Newcor's form (excluding consequential damages) over Western's form (including consequential damages). Rather, it seems to me that the proper question for the jury is whether,

once the conflicting terms in the Western and Newcor forms fall out of the contract (as they would under either a § 2–207(2) or a § 2–207(3) analysis), a sufficiently established trade custom exists which supplements the otherwise-silent contract to supply a term excluding consequential damages.

I would also depart from the majority in its formulation of a critical issue in this case—that is, in supplying terms for such a silent contract, the question is which Code provision should govern: §§ 1–205 and 2–202 invoking trade usage to explain or supplement contract terms or § 2–719 providing only that the *agreement* may exclude consequential damages. Comment 3 to § 2–715 states that: "In the absence of excuse under the section on merchant's excuse by failure of presupposed conditions, the seller is liable for consequential damages in all cases where he had reason to know of the buyer's general or particular requirements at the time of contracting." The Wisconsin Supreme Court has interpreted §§ 2–714 and 2–715 to mean "that a potential recovery for consequential loss is implicit in [a] contract." *Air Products & Chemicals, Inc. v. Fairbanks Morse, Inc.*, 58 Wis.2d 193, 212, 206 N.W.2d 414, 424 (1973). In addition, the UCC "disfavors limitations on remedies and provides for their deletion where they would effectively deprive a party of reasonable protection against breach," despite the fact that § 2–719 allows for the alteration or elimination of the damages remedies otherwise granted under the UCC. *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, 418, 265 N.W.2d 513, 520 (1978).

Nevertheless, in my view, the policy of the UCC may seem to favor an expansive use of trade custom in explaining or supplementing contract terms, even to the point of allowing, without regard to the parties' express agreement, trade custom to supply significant elements of a contract term. *See, e.g., Columbus Milk Producers' Cooperative v. Department of Agriculture*, 48 Wis.2d 451, 459–60, 180 N.W.2d 617, 621 (1970). Once trade usage becomes

a part of the contract, then, like express terms, it may supersede or vary other provisions usually supplied by the Code. J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 100 (1980). Hence, evidence of trade usage may be admitted for the purpose of explaining and supplementing the terms of the contract to the extent of excluding consequential damages. Such a trade usage is not, however, something which arises by express agreement of the parties. "[T]he proof of such usage must be clear and explicit, and the usage so well established, uniform, and so notorious that the parties must be presumed to know it, *and to have contracted in reference to it.*" *Knobel v. J. Bartel Co.,* 176 Wis. 393, 398, 187 N.W. 188, 190 (1922) (emphasis supplied). *See also* White & Summers, *supra,* at 103–04. While this Wisconsin decision antedates adoption of the Uniform Commercial Code, it finds a clear echo in the definition of trade usage provided by the Code itself, § 1–205(2): "A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as *to justify an expectation that it will be observed with respect to the transaction in question*" (emphasis supplied). Further, proof of trade usage, unlike proof of course of dealing or course of performance, usually requires the calling of an expert witness. A published trade code (which Newcor attempted to use in establishing its trade usage) does not necessarily constitute a trade usage and, in any event, it must be a trade code binding on both parties. *See* White & Summer, *supra,* at 104 and n. 33.

I believe the jury should be instructed with these principles of trade usage in mind. The Uniform Commercial Code favors the incorporation of trade custom into the contractual understanding where appropriate. But disclaimer of liability for consequential damages is certainly not something which may be lightly assumed from a flurry of forms between buyer and seller.