FRANK FRIES, Plaintiff-Appellee, *v.* UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.

(No. 12583;

Fourth District—July 31, 1975.

TRAPP, J., dissenting.

Joseph A. Yablonski, of Washington, D. C., and Harold G. Lindholm, of Peoria, for appellant.

Phelps, Russell, Carmody & Kasten, of Carlinville (Carl E. Kasten, of counsel), for appellee.

Mr. JUSTICE GREEN delivered the opinion of the court:

Defendant, the International Union, United Mine Workers of America (U.M.W.A.), appeals from a judgment of the Circuit Court of Macoupin County ordering it to pay plaintiff, Frank W. Fries, a pension of $500 per month until plaintiff's death plus $35,000 in retroactive pension benefits. Defendant challenges the findings of the trial court (1) that there was an oral contract by which the International Union was ob-

ligated to pay plaintiff a pension of $500 per month from the date of his retirement until his death, and (2) that the doctrine of promissory estoppel was also applicable.

In January, 1942, the plaintiff entered into a written employment contract with District 12, U.M.W.A., and the Illinois Coal Operators Association in which it was agreed that he would act as a labor arbitrator in District 12, which encompasses the State of Illinois, and that the district and the operators would each pay half of plaintiff's salary and expenses. Plaintiff testified that this job offer resulted from a request by John L. Lewis to the president of District 12 to find a position for plaintiff. The contract was signed by plaintiff, the president and vice-president of District 12, and the president of the Illinois Coal Operators Association. The signature of John L. Lewis, in his capacity as president of the International Union, also appears on the contract below the other signatures.

In 1950, a similar written contract was entered into by the same parties. At the bottom of that contract the notation "APPROVED:" appears before Lewis' signature. In 1950, plaintiff also entered into a written contract with the Indiana Coal Producers Association and District 11, U.M.W.A. (Indiana), in which plaintiff was employed as a joint umpire in District 11 under similar terms. The signature of John L. Lewis does not appear on that contract. None of these contracts provided for a pension or retirement benefits. After 1950 there were no further written contracts, but plaintiff continued to work as an arbitrator under oral agreements and received raises in salary whenever the miners themselves received pay increases.

During plaintiff's 26 years of employment, although he primarily worked in District 12, he also served regularly in District 11 and, at one time or another, arbitrated in almost every other district of the U.M.W.A.

Plaintiff retired on March 1, 1968, by a letter of resignation which he sent to the Illinois Coal Operators Association and Joe Shannon, then acting president of District 12.

On March 22, 1968, John Owens, secretary-treasurer of the International Union, wrote to plaintiff commending him for his years of service and telling him, "You will be hearing from us before long." In October, 1969, plaintiff wrote to John Owens inquiring about his pension from the union and Owens answered that it had not yet been determined because the union needed to have plaintiff submit a record of his salary and that plaintiff would receive whatever benefits he was entitled to retroactively. However, no pension payments were ever made to plaintiff, and on August 29, 1970, he filed suit against the International Union.

Plaintiff's claim that there was an oral agreement to pay him a pension

is based on conversations he had with union officials including John L. Lewis, Tony Boyle, Tom Kennedy, John Owens, and Joe Shannon. At the time of trial, John L. Lewis and Tom Kennedy were deceased, Tony Boyle was in protective custody following a suicide attempt, and John Owens was too ill to travel. Only Joe Shannon was available to testify.

Plaintiff testified that the first conversation concerning a pension took place about 1960, shortly after the establishment of the U.M.W.A. pension trust, which provided for pensions for union employees. At that time plaintiff was in Washington, D. C. on union business and met with John L. Lewis, then president of the International Union, who told plaintiff, "Of course, Frank, you understand that you will be given a pension at the expiration or the termination of your employment." According to plaintiff, John L. Lewis also told him the amount of his pension would be predicated on his salary as an arbitrator.

Plaintiff also recalled discussing his pension situation with Tom Kennedy and Tony Boyle during the terms that they each served as vice-president of the International Union under John L. Lewis. At different times they each told plaintiff that although he did not come under the union's pension plan, he would be paid retirement benefits based on his salary and computed on the same basis as provided for in the pension plan.

At the 1964 U.M.W.A. convention in Miami, plaintiff had a conversation with John Owens, secretary-treasurer of the International Union. According to plaintiff, Owens said, "Frank, you will be taken care of the same as any of the other officials of the U.M.W.A. when you retire."

Michael Verticchio, a friend of the plaintiff who sometimes assisted him with his arbitration cases, testified that in July, 1967, he and plaintiff had lunch with Joe Shannon, then acting president of District 12 and an International Executive Board member. On that occasion, according to Verticchio, Shannon assured plaintiff that it had been understood for years that he would receive a pension and that he would retire at a full pension, although no specific amount was mentioned. Verticchio also testified that Shannon told plaintiff that he (Shannon) would do anything he could to help plaintiff get his pension.

David Williams, a labor commissioner for the Illinois Coal Operators Association, testified that at the suggestion of the president of the operators association he discussed plaintiff's pension with Joe Shannon several times just before plaintiff retired and told Shannon that the operators would match the amount paid by the union. According to Williams, when no pension from the union was forthcoming, the board of directors of the coal operators decided to pay plaintiff "40% of his base pay from the operators side of the table," which amounted to $170 per month. The

operators have made pension payments to plaintiff in accordance with this decision.

Plaintiff also testified that in September, 1969, after he had retired, he received a telephone call from Tony Boyle, then president of the International Union, who told plaintiff that he wanted him to come to Washington and that he had good news for him. Plaintiff went to Washington accompanied by his nephew, Al Fries, and met with Boyle and Owens. According to plaintiff, Boyle told him that a wonderful pension had been fixed up for him. Both Boyle and Owens told plaintiff that the pension would be $500 per month for life and would be paid retroactively. They mentioned $9000 as the amount of retroactive benefits which had accrued at that time. Al Fries testified that he entered the room toward the end of the discussion and heard Boyle tell plaintiff, "You can expect checks in the mail in a few days." He also heard Owens mention the amount of $9000 in retroactive benefits and recalled that Boyle told plaintiff that the pension the operators had been giving him was "just peanuts," that the union would do better than that, and that the union would try to get the operators to match the amount to be paid by the union.

Joe Shannon, former acting president of District 12 and International Executive Board member, was the sole witness for the union. He testified that he had never told plaintiff that he would pay him a pension or promise that the International Union would pay a pension since he did not have the authority to do so. Shannon conceded that he had discussed the retirement problem with plaintiff on a number of occasions and had told plaintiff that he would use his influence to help get him a pension. He also said that he had discussed plaintiff's situation with officials of the union and the operators in an attempt to help plaintiff secure pension benefits.

■■  Defendant argues that there was no contract because none of the officials of the union with whom plaintiff discussed a pension had either express or apparent authority to bind the defendant union. The question of whether any of the officers of the union had express authority cannot be decided here. Although both plaintiff and defendant argue this issue on the basis of the terms of the constitution of the International Union, U.M.W.A., which sets forth the powers and duties of union officials, that document was not admitted into evidence by the trial court and no question of the propriety of the denial of its admission has been raised on appeal.

Apparent authority has been defined as:

"*  *  *  the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the

other, arising from and in accordance with the other's manifestations to such third persons." Restatement (Second) of Agency § 8 (1958).

According to the *Restatement*, apparent authority is created:

"* * * as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement (Second) of Agency § 27 (1958).

An excellent general discussion of the authority of corporate officers to make pension agreements is provided by *Lee v. Jenkins Brothers*, 268 F.2d 357 (2d Cir. 1959), *cert. denied*, 361 U.S. 913, 4 L.Ed.2d 183, 80 S.Ct. 257. In that case, the court stated that the apparent authority of corporate officers is essentially a question of fact which depends on such factors as the nature of the contract, the officer negotiating it, the circumstances giving rise to the contract, the reasonableness of the contract, the amounts involved, and the identity of the other party. 268 F.2d 357, 370.

■■ Within regard to John L. Lewis, apparent authority arose out of his official status as president of the International Union. Lewis requested the president of District 12 to find a job for plaintiff and approved several of plaintiff's written contracts as labor arbitrator. Given these circumstances, it was not unreasonable for plaintiff to assume that the chief executive of the U.M.W.A., who exercised great influence over his employment, also had the authority to promise him a pension. As the comment to section 27 of the Restatement (Second) of Agency (1958) points out:

"* * * apparent authority can be created by appointing a person to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position * * *."

■■ According to plaintiff's testimony, promises of a pension were made not only by Lewis but also by Tony Boyle (vice-president and later president of the International Union), Tom Kennedy (vice-president of the International Union), and John Owens (secretary-treasurer of the International Union). These men, along with Lewis, filled the highest and most powerful level of offices within the union and were responsible for managing the union on a day-to-day basis. Even if no one of them acting alone could have bound the union, it was not unreasonable for plaintiff to believe that collectively they had sufficient authority to do so.

■■ With regard to Joe Shannon, there is little evidence that he had

any apparent authority to offer plaintiff a pension. Joe Shannon testified that he had no authority to offer plaintiff a pension but had done what he could to help plaintiff get one. Plaintiff's action in seeking payment from the International Union rather than from the district seems to indicate that he did not believe that the district officials on their own had the authority to grant him a pension. Therefore, plaintiff may not rely on the conversations with Joe Shannon as evidence of an oral contract.

■■ Defendant also argues that plaintiff was employed by District 12 and not by the International Union and that, therefore, he should have sought a pension from District 12 rather than from International Union. This argument ignores, however, the role of the International Union in plaintiff's employment as evidenced by the language of the early written contracts and their approval by John L. Lewis and the fact that plaintiff's services as an arbitrator were not limited to District 12 but were performed in most of the other districts of the U.M.W.A. as well. Moreover, defendant has offered no evidence that District 12 would have been authorized to grant plaintiff a pension even if he had been employed solely in that district.

Defendant also contends that the discussions between plaintiff and John L. Lewis and other union officials relating to plaintiff's pension did not constitute a definite offer and acceptance of a pension. The union argues that the discussions in question were merely casual conversations in which the union officials made vague assurances to plaintiff.

■■ An accepted rule of the law of contracts is that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration". (Restatement (Second) of Contracts § 19 (Tent. Drafts Nos. 1—7 1973).) Plaintiff's testimony that in about 1960 John L. Lewis expressly told him that he would receive a pension upon retirement and that the pension would be predicated on plaintiff's salary as arbitrator is not so vague that it would be unreasonable for an employee to interpret it as an offer of a pension. At the time of the conversation, plaintiff was already about 67 years old and had been employed as an arbitrator for approximately 18 years. At that time it would have been natural for plaintiff and his employer to have been thinking about arrangements for plaintiff's retirement.

After the conversation with Lewis, plaintiff continued to work as an arbitrator for approximately 8 more years. An employee may accept an offer of a pension by continuing to work. *Hurd v. Illinois Bell Telephone Co.*, 234 F.2d 942 (7th Cir. 1956), *cert. denied*, 352 U.S. 918, 1 L.Ed.2d 124, 77 S.Ct. 216.

Defendant also contends that there was no contract because the terms

of the pension were too indefinite and uncertain. Section 32 of the Restatement (Second) of Contracts (Tent. Drafts Nos. 1—7 1973) provides:

"(1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

(2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

(3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance."

However, in discussing the problem of indefiniteness of terms Corbin states:

"In the process of negotiating an agreement, a term that is most frequently left indefinite and to be settled by future agreement, or by some other specified method, is the price in money—the compensatory exchange for the subject matter of purchase. This is true both of agreements for the rendition of service and of those for the purchase and sale of goods. If the parties provide a practicable, objective method for determining this price or compensation, not leaving it to the future will of the parties themselves, there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract. The same is true if they agree upon payment of a 'reasonable' price or compensation. There are many cases, however, in which it is clear that the parties have not agreed upon a 'reasonable price,' and also have not prescribed a practicable method of determination. Where this is true, the agreement is too indefinite and uncertain for enforcement. The court should be slow to come to this conclusion if it is convinced that the parties themselves meant to make a 'contract' and to bind themselves to render a future performance. Many a gap in terms can be filled, and should be, with a result that is consistent with what the parties said and that is more just to both than would be a refusal of enforcement." (1 Corbin, Contracts § 97 (1963).)

In *Hunter v. Sparling*, 87 Cal.App.2d 711, 197 P.2d 807 (1948), a California court ruled that a pension contract was not too uncertain to be enforceable where, although employee did not know of employer's precise formula for retirement benefits, he knew of the existence of such a formula.

■■ In the instant case, several officials, including Tony Boyle and Tom Kennedy, indicated to plaintiff that his pension would be computed

on the same basis as the pensions for officials covered by the union pension plan even though he did not qualify for the plan. However, the union pension plan, like the constitution, was not admitted into evidence by the trial court, and the issue of its admission has not been raised on appeal. After plaintiff retired he was told by Tony Boyle that he would get a pension of $500 per month paid retroactively. This was an admission by a responsible official of the union of the amount payable under the pension plan to a person similarly situated. Thus, there appears to have been sufficient basis for computing plaintiff's pension.

We conclude that the trial court's finding of an oral contract was supported by the evidence. Therefore, we need not consider the trial court's alternative finding of promissory estoppel. Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

SIMKINS, P. J., concurs.

Mr. JUSTICE TRAPP, dissenting:

The judgment at issue results in the specific performance of an alleged oral contract for a "monthly retirement benefit of $500," together with an agreed $35,000 to be paid from the general funds of the defendant union.

It is generally recognized that the conduct and business affairs of a labor union is governed by the constitution and bylaws of such union. 24 Ill. L.&Pr. *Labor Relations* § 12, at 158 (1956); *O'Brien v. Matual,* 14 Ill.App.2d 173, 144 N.E.2d 446.

The amended complaint alleges that "officials and agents of the defendant" orally agreed that plaintiff would be paid "retirement benefits" by the defendant union. One claiming the authority of an agent must prove such authority by a preponderance of the evidence. *Easterday v. Marchman,* 36 Ill.App.2d 321, 183 N.E.2d 182.

The only evidence by plaintiff of the "agent's authority" to contract for such retirement benefits from the union funds is the description as officers of the defendant. From such status the principle opinion concludes that it is reasonable to assume that the officers had such authority. The record shows that plaintiff, in fact, succeeded in keeping the Union constitution and bylaws from being introduced into evidence upon the issue of authority. In terms of the quotation from section 27 of the Restatement (Second) of Agency (1958), there is no evidence that such oral contracts were among the "generally recognized duties" of the officers or that the making of such oral contracts was "one of the things ordinarily entrusted to one occupying such a position."

The amended complaint alleges that plaintiff was an "employee" of

defendant and his testimony shows that plaintiff was a member of the union and was aware of and discussed with union officers the pension plan provided for employees of the defendant. The purported conversations with the union officers upon which plaintiff testified were generally in terms of his obtaining a pension. The correspondence introduced by plaintiff as exhibits shows that he was speaking of "my retirement pension from the United Mine Workers," and of "an application for my pension." Despite such pleading and evidence, plaintiff, at trial, disavowed that he was an employee of the union or that he came under the union employee's pension plan, but seeks to recover an amount equal to the pension provided in the plan through the asserted oral agreements.

As pointed out in defendant's motion to dismiss the amended complaint, the plaintiff's original complaint was framed in terms of a pension under the union pension plan, but by reason of the pleading and procedure followed such issue cannot now be reached.

The evidence of authority to make an oral agreement for "retirement benefits" from union funds separately and distinguished from the authorized pension plan is not sufficient to support the specific performance provided in the judgment.