**Marjorie B. PRICE, Plaintiff,**

v.

**HIGHLAND COMMUNITY BANK and George R. Brokemond, Defendants.**

No. 87 C 6259.

United States District Court,
N.D. Illinois, E.D.

Sept. 21, 1989.

Tom H. Luetkemeyer, Hinshaw, Culbertson, Moelman, Hoban & Fuller, Chicago, Ill., for plaintiff, Marjorie B. Price.

Jeffrey S. Goldman, Fox and Grove, Chtd., Chicago, Ill., for defendants, Highland Comm. Bank and Geo. R. Brokemond.

## DECISION

POSNER, Circuit Judge (sitting by designation).

I have before me the defendants' post-trial motions in this fraud and breach of contract case that pitted Marjorie B. Price against Highland Community Bank and its president, George R. Brokemond. At the end of a four-day trial in June (at which I presided by designation of the chief judge of the circuit to help the district court with its heavy caseload), the jury found in favor of Price and directed the defendants to pay her $25,000 in compensatory damages for the fraud and the breach of contract and $150,000 in punitive damages for the fraud. Although the jury was asked to assess compensatory damages separately on the two counts, the parties had agreed beforehand that the plaintiff was entitled to only a single recovery, since the harms allegedly caused by the two violations were identical. Cf. *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128, 1146 (7th Cir.1985).

I declined to enter judgment on the jury's verdict and instead set a briefing schedule for post-trial motions. The last brief was filed on August 3 and the case is now ripe for final decision. The defendants' motions ask, alternatively, for judgment notwithstanding the verdict, for a new trial, and for a reduction in the compensatory and punitive damages awarded by the jury.

■ The suit had originally been filed in an Illinois state court, in June 1987, but because it claimed among other things that the bank had violated the terms of a profit-sharing plan, the defendants were able to remove the suit to this court as an ERISA suit, see *Brundage–Peterson v. Compcare Health Services Ins. Corp.,* 877 F.2d 509, 510 (7th Cir.1989), with pendent claims for fraud and breach of contract under the common law of Illinois, see *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The plaintiff then dropped her ERISA claim, but this did not affect federal jurisdiction, which with immaterial exceptions depends on the facts and claims when the suit is removed, rather than on subsequent developments. See, e.g., *In re Carter,* 618 F.2d 1093, 1101 (5th Cir.1980). Although the general rule is that if the federal claim falls out before trial the district judge will relinquish jurisdiction over the pendent state-law claims, see *United Mine Workers v. Gibbs, supra,* 383 U.S. at 726, 86 S.Ct. at 1139; *Blau Plumbing, Inc. v. SOS Fix–It, Inc.,* 781 F.2d 604, 611–12 (7th Cir.1986), there are a number of exceptions, for example where there is a dispositive federal defense to the pendent state claim or where the statute of limitations has run and would therefore bar a refiled claim. See, e.g., *Rosado v. Wyman,* 397 U.S. 397, 402–05, 90 S.Ct. 1207, 1212–14, 25 L.Ed.2d 442 (1970); *Graf v. Elgin, Joliet & Eastern Ry.,* 790 F.2d 1341, 1347–48 (7th Cir.1986); *United States v. Zima,* 766 F.2d 1153, 1158–59 (7th Cir. 1985).

The present case invites the creation of a new exception, for the case where the suit was properly removed and the plaintiff then decided to abandon his federal claim. The existence of such an exception is implicit in the Supreme Court's decision in *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). The plaintiffs in that case had filed a complaint in state court that contained a mixture of federal and state claims. The defendants removed the case to federal court, and later the plaintiffs both abandoned their federal claim and moved to remand the case to state court. The issue in the Supreme Court was whether the district court had the power to remand the case, or whether its only mode of relinquishing jurisdiction over the state law claims was to dismiss the case. In the course of holding that the district court had the power to remand the case, the Supreme Court remarked that "when the single federal-law claim in the action was eliminated at an early stage of the litigation, the District Court had a powerful reason to choose not to continue to exercise jurisdiction." *Id.,* 108 S.Ct. at 619. The Court did not hold, however, that it would have been improper for the district court to retain jurisdiction—a course of action the plaintiffs were not requesting. Here neither party asked to return to state court. On the contrary, both sides were eager to try the case in federal court rather than rejoin the long state-court queue. The case when it came to me had been in federal court almost two years, and all preparations for trial had been completed. In the circumstances I did not and do not think that I was required to relinquish jurisdiction by dismissing or remanding the case.

I said that both sides were eager to try the case but it would be more accurate to say that the defendants were unwilling to settle it. At a pretrial conference on the eve of trial, the plaintiff's lawyer offered to settle the case for a very modest amount and made clear that this was his initial, not his final, offer. The defendants refused to consider settlement, a refusal that in retrospect was imprudent but that is immaterial to my consideration of the issues raised by the post-trial motions.

The essential facts and areas of contention can be described briefly. Highland Community Bank is a successful minority bank in the southern part of Chicago, with assets last year of about $80 million, net income of almost $800,000, and about fifty employees. Its president, chief executive officer, and unquestioned boss, George Brokemond, is an able, knowledgeable, and aggressive banker whose energy and skill appear to be the principal ingredients in the bank's success. Late in 1983 Brokemond decided to experiment with creating a separate marketing staff in the bank. He hired Linda Hurley to head up the new staff. On March 1, 1984, Hurley hired Marjorie Price, the plaintiff, for the marketing staff. Price at the time was working in a different capacity for Continental bank, but Continental had just announced a reduction in force that would abolish Price's job, and her prospects for finding another job in Continental were shaky. She initially accepted a substantial reduction in salary to come with Highland—from $37,500 to $25,000—but later she persuaded Hurley (who persuaded Brokemond) to raise her salary to $30,000. According to Price's testimony, which Hurley corroborated, Price accepted a lower salary than she was getting at Continental in part because she was promised an incentive-compensation plan, which she had not had at Continental.

Price remained at Highland Community Bank for two years and eight months, leaving voluntarily to accept a marketing position at another minority bank in Chicago. She received no incentive compensation at Highland—indeed no incentive-compensation plan was ever put into effect—and this, she testified, was a determining factor in her decision to leave. Hurley left the bank around the same time and now works for the State of Washington. She has no successor; the marketing staff has been disbanded.

The first question raised by the motion for judgment notwithstanding the verdict is whether there was an enforceable contract between the bank and Marjorie Price to

establish an incentive-compensation plan. The plaintiff's theory is that the contract can be inferred from a pair of letters and from oral statements by Brokemond and Hurley. The first letter, plaintiff's exhibit 4, is from Brokemond to Price and is dated February 11, 1984—before Price signed on. The letter describes the work of the marketing staff in relation to four principal bank products. One is treasury tax and loan deposits, and the letter states that "an incentive program will be structured to pay you some percentage of the [bank's] income over and above" a stated base requirement, but the percentage is not specified. With regard to consortium lines of credit (another product), the letter says that "anything over and above [a specified fee income generated] would be part of another type bonus consideration," and "we can discuss a 5% figure once you reach the [specified] level." With regard to the other products as well, bonus awards are mentioned with more or less specificity and in addition the letter says "I think that you will find the incentive program to be of great interest and potential profit."

Several months after Price had begun working for the bank, Brokemond sent her another letter, this one dated August 13, 1984 (plaintiff's exhibit 5), which confirmed the terms of her employment and included a statement that while she would be eligible to participate in the employee profit-sharing plan at the end of her first year, "the incentive program outlined in my letter dated February 11, 1984 goes into effect immediately." The letter also reflects the bank's agreement to pay her an annual salary of $30,000, rather than $25,000 as first agreed. At the bottom of the letter is a space for Price to sign her name under the caption "terms and conditions accepted," which she duly did.

According to her and Hurley's testimony, the incentive program was of great interest to the members of the marketing staff, and Brokemond repeatedly assured them that the program was in the works and would soon be made final. Hurley repeated these assurances to Price, who also heard them directly from Brokemond. But according to Brokemond's own testimony at trial, he never did devise such a program or place it in effect. He regarded the terms sketched in his letter of February 11 as preliminary thoughts, tentative and nonbinding, speculative and ruminative; and, distracted by other matters, he never progressed to the point of settling on the terms of the program and putting it into effect. In part this was because he was dissatisfied with the marketing staff, which he regarded as an experiment and ultimately as a failed experiment. He considered himself the principal marketer of the bank's products and doubted whether the cost of the marketing department was justified. Since the events in this case, the bank has as I have noted abolished the department.

■ If there was a contract, there was a breach—but was there a contract? When the question is whether a contract has been formed from a series of writings plus oral statements, the answer is within the lap of the jury, see, e.g., *Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1205 (7th Cir.1984); *Meyers v. Selznick Co.*, 373 F.2d 218, 222–23 (2d Cir. 1966); Farnsworth, Contracts 516–17 (1982), and can be disturbed only if unreasonable. I have cited federal cases on this point because the allocation of power between judge and jury in a federal diversity case is a question of federal rather than state law. *Byrd v. Blue Ridge Rural Electric Coop., Inc.*, 356 U.S. 525, 538, 78 S.Ct. 893, 901, 2 L.Ed.2d 953 (1958). Cases so holding with specific reference to the respective roles of judge and jury in the interpretation of contracts include *Agfa–Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1521 (7th Cir.1989); *Cooper Laboratories, Inc. v. International Surplus Lines Ins. Co.*, 802 F.2d 667, 671 (3d Cir. 1986); and *Meyers v. Selznick Co., supra,* 373 F.2d at 222 n. 1 (Friendly, J.).

■ The jury's finding that there was a contract in this case was reasonable. Apart from oral promises that the jury was entitled to find that Brokemond had made, the letters of February 4 and August 11 can easily be read to promise the implementation, immediately upon Price's beginning

her employment with the bank, of an incentive-compensation program.

■ The more difficult question is whether, assuming there was a contract, it is too indefinite to enforce, since a number of terms (e.g., the percentage compensation for the treasury tax and loan deposits) were not specified ("some percentage"). The modern approach to issues of contractual vagueness, heavily influenced by Cardozo's opinions for the New York Court of Appeals, asks whether the contract is too vague for the court to be able to provide a remedy for breach. See, e.g., *Outlet Embroidery Co. v. Derwent Mills, Ltd.*, 254 N.Y. 179, 172 N.E. 462 (1930); *Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.*, 232 N.Y. 112, 133 N.E. 370 (1921); *Moran v. Standard Oil Co.*, 211 N.Y. 187, 105 N.E. 217 (1914); *Fries v. United Mine Workers*, 30 Ill.App.3d 575, 333 N.E.2d 600 (1975); *David M. Kaufman Associates, Inc. v. Lake County Trust Co.*, 157 Ill. App.3d 926, 109 Ill.Dec. 851, 510 N.E.2d 919 (1987); Restatement, Second, Contracts § 33(2) (1981). If terms can be interpolated from industry custom, a remedy can be provided and the contract will be enforced. That route was not followed here. In part no doubt because of the limited stakes in this lawsuit as the plaintiff perceived them, she made no effort to establish the existence or terms of incentive-compensation programs for marketing officers in banks (minority or otherwise) in the Chicago area or elsewhere. Nor did the defendants introduce any evidence on that score. However, Brokemond's letter of February 11 to Price is fairly detailed, and the principal omission—the failure to specify a percentage compensation for the treasury tax and loan deposits—is virtually academic, since the plaintiff asked the jury for only $865.55 in damages with regard to this part of the promised incentive program. The plaintiff asked for a total of $27,543.80 in compensatory damages and the jury shaved roughly ten percent from the request; so it may well have awarded her nothing for her marketing of treasury tax and loan deposits. The plaintiff's reconstruction of the terms of the promised but never implemented incentive program was within the bounds of

reason, bearing in mind that the contract breaker should not be allowed to profit from conduct that makes the computation of damages for the breach of the contract more difficult than it would have been but for that conduct. See, e.g., *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946); *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 383 (7th Cir.1986); *Locke v. United States*, 283 F.2d 521, 524–25 (Ct.Cl.1960); Farnsworth, *supra*, at 882. There was an enforceable contract, and the bank broke it.

■ The bank argues, however, that even if there was a breach, under the instructions I gave to the jury there could be no damages. An agreed instruction required Price to show, in order to obtain damages for breach of contract, that she was the "procuring cause" of Highland bank business; for the parties agreed that the incentive compensation was intended to be based on the amount of business that the bank did for which Price was in some sense responsible. But in what sense? The bank argues that it had to be brand-new business, from new customers, but the instruction does not say this; nor the letters; nor would such a restriction make any sense, for it would give the marketing staff an incentive to disregard old customers. The jury could reasonably have found that Price was the "procuring cause" of any business that she had a significant influence in bringing into or retaining for the bank, even though it was from an existing customer.

■ So much for the contract claim. The next question is, Was there fraud? Had I been the trier of fact, I would have found for the defendants on this question. The most plausible explanation of what happened is that Brokemond initially and as late as August 11, 1984, intended to establish an incentive program consistent with the terms sketched in the February 4 letter, but that he later changed his mind because he was dissatisfied with the performance of the marketing staff. A change of mind can be and here was (as the

jury found, I think correctly) a breach of contract, but it is not fraud.

The principal evidence of fraud is Brokemond's admission that he never intended his representations concerning the incentive program to be contractually binding. A rational jury could infer from this, with the confidence required in a fraud case, that Brokemond made promises to Price, both orally and in the letters (especially the second letter), intending not to keep them. While it is true that Illinois does not make fraudulent promising actionable as such, there is (as the jury was instructed) an exception if the promise is "the scheme to accomplish a fraud." The exception, as has rightly been observed, has swallowed the rule. *Vance Pearson, Inc. v. Alexander,* 86 Ill.App.3d 1105, 1112, 42 Ill.Dec. 204, 209, 408 N.E.2d 782, 787 (1980). As I interpret the Illinois law, consistent with *Pearson* and other cases, if the intention behind the intentionally false promise is to induce the promisee to act for the promisor's benefit, the promise is actionable. Here the benefit would consist of Price's agreeing to work for Highland for a lower salary than if she had not been promised incentive compensation. There was adequate evidence, as we shall see, that the benefit was induced by the promise.

But was there clear and convincing evidence that the promise was deliberately false? There was. Brokemond *testified* that he never intended to commit himself to set up the promised incentive-compensation program. A party's admission in testimony can be clear and convincing evidence. *United States v. Ostrowsky,* 501 F.2d 318, 323 (7th Cir.1974). Indeed, courts often treat such an admission as *conclusive* evidence, and while this may go too far, as argued in McCormick on Evidence § 266 (3d ed., Cleary ed. 1984), it indicates the futility of arguing that a testimonial admission cannot be clear and convincing evidence. I suspect that Brokemond testified as he did to defeat the contract claim, not realizing that he might be accusing himself of making a knowingly false promise. But the interpretation of his testimony was a matter for the jury.

The defendants have a back-up position: that there was no reliance on the false promises; that Marjorie Price would have gone to work for the Highland bank and stayed there even if there had been no promise of incentive compensation. She testified that she would not have, and, although I am skeptical, I cannot second-guess the jury's determination in the matter. People don't like to accept salary cuts, and without the incentive-compensation program she might have tried harder to find another job at Continental or elsewhere. She appears to be eminently employable, for she is now the director of marketing at the Drexel National Bank, another national bank in Chicago, at a salary of $45,000 (with no incentive program—she testified that she has had it with such programs!). Of course she has five years more experience than when she signed on with Highland Community Bank for $30,000, and there has been some inflation during this period, although not a great deal. Nevertheless the jury was entitled to infer that the promise of an incentive-compensation program was a material inducement in her decision to accept Highland's offer.

I therefore deny the motion for judgment notwithstanding the verdict and move on to the issues raised by the defendants' other post-trial motions. Eleven points are raised, but I shall discuss only the salient ones; I have considered, and reject, the rest. The first issue I discuss is whether I erred by instructing the jury on the theory of contractual liability announced by the Supreme Court of Illinois in *Duldulao v. St. Mary of Nazareth Hospital,* 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987). That case holds that a manual for employees can create contractual rights and obligations, provided it manifests an intention by the employer to be bound by the undertakings in the manual. The defendants in this case point out correctly that the bank had no employment manual. But the instruction in question (number 10) did not say it had. So far as pertinent to the defendants' argument it said only that the jury must find an enforceable obligation "if the defendants' pol-

icies or statements contained a promise clear enough that an employee would reasonably believe that an offer has been made." Brokemond's letters and oral statements could be considered policies or statements containing promises clear enough to make a reasonable employee believe that he could rely upon and enforce them. The principle announced in *Duldulao* and repeated in instruction 10 transcends employment manuals and, if anything, is more apt to this case than to *Duldulao* itself, since this case contains express promises in an individually negotiated employment relationship.

■ Next, the defendants, relying very heavily on opinions of the Seventh Circuit in which I have criticized plaintiffs for the quality of their evidence of damages, see, e.g., *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 623–24 (7th Cir.1989), argue that I should grant a new trial on the issue of compensatory damages, or at least grant a remittitur, because the plaintiff's evidence was inadequate. Unfortunately the defendants' discussion of the issue is bare of particulars. In any event I do not think the jury exceeded the bounds of reason in awarding Price $25,000 in compensatory damages. Since the incentive program was never fully specified or implemented, there was an inescapable but permissible element of speculation involved in estimating what incentive compensation she would have earned but for the defendants' misconduct. The damages average out to $9,375 per year (recall that Price was employed by the bank for two years and eight months), which means that under her theory of damages she would have received total compensation of almost $40,000 had the bank honored its promises. This would have been slightly more than her earnings at Continental but less than her present earnings at Drexel and I cannot say that it is an unreasonable estimate or one unsupported by the evidence.

■ The remaining issues concern the fraud count. First and least, the defendants argue that the plaintiff should not have been allowed to use at trial oral representations that Brokemond allegedly made to her, since the complaint mentioned only the February 4 and August 11 letters; and fraud must be pleaded with particularity. See Fed.R.Civ.P. 9(b). However, the plaintiff was using to prove the fraudulent character of the promise to establish an incentive-compensation program not Brokemond's oral *representations* (except incidentally and cumulatively), but his statement that he never intended to put the program into effect. This statement has nothing to do with the pleading requirements of Rule 9(b). All the cases ever require to be pleaded with specificity is the misrepresentations, not the circumstances that demonstrate their falsity. See, e.g., *Haroco, Inc v. American National Bank & Trust Co.*, 747 F.2d 384, 405 (7th Cir. 1984), aff'd per curiam, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *Luce v. Edelstein*, 802 F.2d 49, 54–55 (2d Cir.1986); *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984).

■ The defendants complain that instruction number 20 was in error in allowing the jury to award punitive damages for fraud if it found "from a preponderance of the evidence that the plaintiff is entitled to actual or compensatory damages." The fraud instruction correctly placed on the plaintiff the burden of proving fraud by clear and convincing evidence. Instruction 20 was not erroneous, for its office was not to set the burden of proof for fraud but merely to require that the jury find *some* actual damages before it went on to consider whether to award punitive damages. Nor do I think it likely to have misled the jury, in the context of the full instructions. See *Needham v. White Laboratories, Inc.*, 847 F.2d 355, 358 (7th Cir.1988); *Goldman v. Fadell*, 844 F.2d 1297, 1302 (7th Cir. 1988).

■ Finally and in a variety of ways the defendants object to the award of punitive damages and particularly to the amount of the award. The first objection has no merit. Punitive damages are routinely awarded for deliberate torts, and if there was fraud here it was deliberate. The defendants do not question the vica-

rious liability of the bank for punitive damages, and would be on weak footing if they did, for while Illinois follows the "complicity rule" and thus refuses to allow punitive damages to be awarded on a theory of respondeat superior, see *Oakview New Lenox School District No. 122 v. Ford Motor Co.*, 61 Ill.App.3d 194, 199–200, 19 Ill.Dec. 43, 47–48, 378 N.E.2d 544, 548–49 (1978); *Tolle v. Interstate Systems Truck Lines, Inc.*, 42 Ill.App.3d 771, 1 Ill.Dec. 437, 356 N.E.2d 625 (1976); *Douglass v. Hustler Magazine, Inc.*, *supra*, 769 F.2d at 1145–46, the rule is satisfied by proof of wrongdoing by a corporate officer—Brokemond. See *id.* at 1145.

■ But I agree with the defendants that the award was grossly excessive. Of course it is wrongful to promise an employee a benefit knowing that you do not intend to give it to him and by doing so to discourage the employee from exploring alternative opportunities. But on the scale of wrongs prevalent in our society this one ranks pretty low, and I think a year's salary—$30,000—is, in the circumstances, the maximum punishment that each defendant should be made to pay for such a wrong, consistent with contemporary norms of fair dealing and commercial reasonableness. No evidence was offered that Brokemond committed this fraud as part of some larger and nefarious scheme to enrich himself or his bank at the expense of his employees, and the award of compensatory damages is a generous one. Considering the gravity of the wrong, and the plaintiff's failure to present evidence concerning Brokemond's financial wherewithal, see generally *Hazelwood v. Illinois Central Gulf R.R.*, 114 Ill.App.3d 703, 712–13, 71 Ill.Dec. 320, 328, 450 N.E.2d 1199, 1207 (1983), I conclude that the defendants are entitled to a remittitur that will bring the total judgment down from $175,000 to $85,-000 ($25,000 in compensatory damages plus $30,000 in punitive damages against each defendant). If the plaintiff declines the remittitur, the case will be set for a new trial limited to damages; if she accepts it, I will enter final judgment for $85,000. The plaintiff is directed to submit a statement accepting or rejecting the remittitur within two weeks from today.

SO ORDERED.