932 F.2d 601
 Marjorie B. PRICE, Plaintiff-Appellee,
v.
HIGHLAND COMMUNITY BANK and George R. Brokemond,
Defendants-Appellants.
 No. 89-3518.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 8, 1990.
Decided May 3, 1991.
 
 Robert S. Minetz, Tom H. Luetkemeyer, James E. McParkland, Hinshaw & Culbertson, Chicago, Ill., for plaintiff-appellee.
 Lawrence M. Cohen, Barbara B. Levine, Cary Schwimmer, Jeffrey S. Goldman, Sara F. Mintz, Fox & Grove, Chicago, Ill., for defendants-appellants.
 Before CUMMINGS, MANION and KANNE, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 In June 1987 plaintiff Marjorie Price sued Highland Community Bank and its president, George R. Brokemond, in the Circuit Court of Cook County, Illinois, but the suit was thereafter removed by defendants to the federal district court on the ground that federal rights under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1001 et seq., were involved. Count I alleged breach of contract and Count II alleged fraud. Plaintiff dropped her ERISA claim, but the district court retained jurisdiction over the case on the ground that an exception to the general relinquishment of jurisdiction rule of United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), was warranted here because the suit was properly removed by defendants, with the plaintiff subsequently deciding to abandon her federal claim. This ruling has not been contested since both sides were eager to have the case tried in federal court.
 
 
 2
 Plaintiff was formerly an assistant vice president of Highland Community Bank ("Highland") in Chicago. She sued Highland and its president Brokemond on the ground that Highland, through Brokemond, promised that she would benefit from an incentive compensation program as a supplement to her base salary. She accepted the offer to work for Highland in reliance on that promise, but defendants failed to pay her any incentive compensation. She claimed that Highland and Brokemond breached their contract with her and also committed fraud.
 
 
 3
 Both breach of contract and fraud claims were tried before a jury which returned a verdict in plaintiff's favor on both counts and awarded her $25,000 in compensatory damages for the fraud and breach of contract and $150,000 in punitive damages for the fraud. The trial judge denied defendants' motions for a new trial and for judgment notwithstanding the verdict but did grant them a remittitur reducing the judgment to $25,000 in compensatory damages plus $30,000 in punitive damages against each defendant, for a total of $85,000. 722 F.Supp. 454. Price accepted the remittitur.
 
 
 4
 Appended to this opinion are the two letters to plaintiff from Brokemond on which she relies. According to Price, the first letter, dated February 11, 1984, prompted her to accept the position at Highland. She worked there from March 1, 1984, until her departure in November 1986 for a new position at the Drexel National Bank. In his letter, Brokemond promised Price an incentive program "structured to pay you some percentage of the income over and above the base requirement of $7-$12,000 per month" in return for Price's obtaining deposits which would generate $7,000-$12,000 in income coming from monthly deposits of $40,000-$50,000. In the second letter, dated August 13, 1984, Brokemond wrote that plaintiff was to be an assistant vice president earning a base salary of $30,000 and that "the incentive program outlined in my letter dated February 11, 1984 goes into effect immediately." Plaintiff accepted in writing the terms and conditions outlined in the August 13 letter.
 
 
 5
 According to the evidence, before joining Highland plaintiff was employed at the Continental Bank in Chicago with a salary of $37,200. She agreed to a starting salary of $25,000 at Highland because she believed that the incentive compensation program would supplement her income. Before accepting employment at Highland, plaintiff attended a meeting in Brokemond's office where he promised to send her a letter concerning the incentive compensation program. That is the February 11 letter discussed above. Five months after Price became an officer of Highland, Brokemond sent her the August 13 letter, also discussed above, stating that the incentive compensation program would go into effect immediately.
 
 
 6
 Brokemond admitted that he sent the August 13 letter to induce plaintiff to stay at Highland even though he admitted that as of that date he had not agreed to an incentive compensation program for her. Nevertheless, at subsequent meetings, Brokemond discussed the incentive compensation program with plaintiff and other Highland officials, saying that he would finalize that program. In her testimony, Linda Hurley, another Highland vice president, ascribed similar statements to Brokemond. As noted, the jury agreed with plaintiff's version of the facts and therefore found in her favor.
 
 Breach of contract
 
 7
 Brokemond's letters of February 11 and August 13, 1984, promised an incentive compensation program to plaintiff, and he orally promised plaintiff that he was finalizing the incentive compensation program although he apparently did not intend to do so. Brokemond testified at trial that he never agreed to an incentive compensation program for plaintiff. He breached similar promises to Linda Hurley and Keith Brown, another marketing representative of Highland. The jury considered all of the facts and circumstances concerning the two letters and concluded that Brokemond explicitly promised her the benefit of the incentive compensation program. Western Industries, Inc. v. Newcor Canada, Ltd., 739 F.2d 1198, 1205 (7th Cir.1984); La Salle Nat'l Bank v. General Mills Restaurant Group, Inc., 854 F.2d 1050, 1052 (7th Cir.1988).
 
 
 8
 As the trial judge noted, it was reasonable for the jury to conclude that there was a breach of contract in this case in view of Brokemond's oral promises to plaintiff and his letters of February 11 and August 13. In the opinion below, he added:
 
 
 9
 The jury could reasonably have found that Price was the "procuring cause" of any business that she had a significant influence in bringing into or retaining for the bank, even though it was from an existing customer.
 
 
 10
 District Court Decision at 9. Thus there was ample evidence to support the breach of contract count.
 
 Fraud
 
 11
 Plaintiff's theory of fraud was that the defendants never intended to implement the incentive compensation program and that defendants used the program to induce her to work for Highland. Whereas the letters of February 11 and August 13 promised to implement that program, other evidence convinced the jury that the defendants had no intention of doing so. For instance, Brokemond testified that he never intended to commit himself to establish the promised incentive compensation program. That was sufficient evidence for the jury to find fraud. Since the deliberate misrepresentations by Brokemond persuaded plaintiff to work for Highland, the jury was entitled to infer that fraud induced her to accept Highland's offer. Given that her current employment at another bank pays Price an annual salary of $45,000 and that she previously earned $37,200 annually at the Continental Bank, plaintiff plainly expected greater compensation from Highland than her $30,000 base salary. The separate elements for actionable fraud have been shown in satisfaction of the requirements set forth in Brudnicki v. General Electric Co., 535 F.Supp. 84, 88 (N.D.Ill.1982), on which defendants rely (Reply Br. 8-9). There the district court permitted the plaintiff to preserve a fraud claim, because it read Illinois law to permit such a claim where a false representation to perform a future act is the "deliberate device" used to induce the plaintiff to enter an agreement to his detriment.
 
 Instructions
 
 12
 The defendants cannot rightly fault jury instruction 10 stating that there would be an enforceable obligation if defendants' policies or statements contained "a promise clear enough that an employee would reasonably believe that an offer had been made." This was taken from Duldulao v. St. Mary of Nazareth Hospital Center, 115 Ill.2d 482, 490, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987). Here the two letters and oral statements of Brokemond warranted the instruction.
 
 
 13
 Likewise instruction 20 was not erroneous as to proving fraud in that it used a preponderance of the evidence standard for compensatory damages. The fraud instruction told the jury that plaintiff had the burden of proving fraud by clear and convincing evidence. Therefore the jury was not misled.
 
 Damages
 
 14
 Highland asserts that the jury award of $25,000 in compensatory damages was excessive. The compensatory damages awarded plaintiff for her two years and eight months employment amounted to $9,375 per year or $25,000. However, plaintiff produced evidence of $40,000 in damages, less than her present earnings at the Drexel National Bank and only slightly more than her earnings at the Continental Bank. As the trial judge put it in his opinion:
 
 
 15
 Since the incentive program was never fully specified or implemented, there was an inescapable but permissible element of speculation involved in estimating what incentive compensation she would have earned but for the defendants' misconduct.
 
 
 16
 District Court Decision at 12. As plaintiff observes, the evidence supported the jury's award of damages because the jury, when it arrived at a figure, had the client assignment list of the defendant bank, evidence of the work performed by Price with regard to each of the assigned clients, the 1985 new business analysis showing the increase in each business category attributable to the plaintiff, and the actual production figures for all of Price's accounts (Br. 39-40). In these circumstances we are unwilling to upset the $25,000 compensatory damages award.
 
 
 17
 As to the $30,000 punitive damages each defendant must pay under the remittitur, Brokemond complains that he should not be liable for this amount because his seemingly modest financial status was not adduced.[1] Defendants state that Brokemond does not earn even a fraction of the bank's $800,000 net income (Reply Br. 18). However, in the case of a defendant of seemingly modest means, a plaintiff "may obtain an award for such [punitive] damages without introducing evidence of the defendant's monetary resources." Wilson v. Colston, 120 Ill.App.3d 150, 153, 75 Ill.Dec. 600, 457 N.E.2d 1042 (5th Dist.1983). As to the financial status of the bank, the record shows that the punitive damages awarded against it is only a small part of its 1988 profits. The amount awarded against each defendant was easily justified by the blatant fraud committed. Consequently, the amount of $30,000 specified in the remittitur, which consisted of a year's Highland salary to plaintiff as damages from each defendant for fraud, was well within bounds.
 
 
 18
 While defendants submit that the award of punitive damages violates the Fifth and Fourteenth Amendments, the Supreme Court recently answered this argument, upholding the constitutionality of punitive damages except in limited circumstances inapplicable here. Pacific Mutual Life Ins. Co. v. Haslip, --- U.S. ----, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Defendants have been unable to show that the $30,000 imposed against each under the remittitur caused them any undue hardship.
 
 
 19
 Judgment affirmed.
 
 
 20
 [HCB]
HIGHLAND COMMUNITY BANK
1701 WEST 87th STREET . CHICAGO, IL 60620
MEMBER FDIC 312/681-6800
 February 11, 1984
 Ms. Marjorie B. Price
 5104 South Kimbark Avenue
 Chicago, Illinois 60615
 Dear Marjorie:
 Pursuant to your recent conversation with Linda, I am submitting my
 thoughts relative to the slot we are currently trying to fill. The
 person(s) we need must have refined communication skills, sales
 ability, some experience in dealing with major corporations, be a
 quick study, and above all know how to close a deal. They will be
 soliciting business from major national corporations and interfacing
 with Cash Managers, Assistant Treasurers, and in some instances the
 Treasurer. The marketing function reports directly to me and a good
 deal of planning is handled as a group activity. We would want this
 person to concentrate on the four primary products that we sell to
 national corporations: Treasury Tax and Loan (TT&L) deposits,
 consortium lines of credit with Highland as the lead bank, check
 processing, and leasing.
 In the area of TT&L the present customer base has to be preserved,
 maintained, and enhanced. The goal for the new person would be to
 obtain deposits which would generate from $7-$12,000 per month in
 income. It would take approximately $40-$50,000,000 in monthly
 deposits which could come from one or a number of companies. An
 incentive program will be structured to pay you some percentage of
 the income over and above the base requirement of $7-$12,000 per
 month. I have enclosed a copy of a letter mailed to about 40
 companies relative to the "Westinghouse" program which is another
 service to sell with a goal of getting three (3) new customers
 during 1984.
 In the area of national consortium lines of credit, wherein Highland
 would be the "Agency Bank," we are looking to you to generate
 $75,000 per year in fee income. Anything over and above would be
 part of another type bonus consideration. Normally the "Agent Bank"
 gets 1/4 of 1% as the agency fee, therefore we would need to
 generate $30,000,000 in credits to be participated among other
 Minority banks. We can discuss a 5% figure once you reach the
 $75,000 level.
 I have enclosed an internal memo about our check processing
 business. As far as I know we have the only full blown data
 processing function operated by any Black Minority owned bank in the
 country. We
 EXHIBIT "A" 000005
 Ms. Marjorie B. Price
 February 11, 1984
 Page 2
 currently process about 1,300,000 checks per month for a customer
 base that currently includes seven national medicare providers; New
 York, California, New Jersey, Illinois, Oklahoma, Louisiana, and the
 state of Washington. Among our corporate customers we number
 Standard Oil, Quaker Oats, Zenith, Kellogg, Montgomery Wards, Sears,
 Kraft, Amoco Foundation, and Esmark. We already have a presence with
 a number of other companies for whom we don't provide certain
 services. What we need to do is get more business out of customers
 we already have plus plow some new ground. I want to move the check
 processing figure to 1,500,000 in 1984 from its present level.
 Another piece of the overall incentive program would provide
 incremental bonus awards at 25, 50, 75, and 100,000 additional items
 towards our goal.
 We are also in the leasing business principally in the area of
 electronic data processing equipment. Incentives apply also to new
 leasing business generated. As you can see all of these products are
 built along the "spine" of MONEY and every major company in business
 is concerned with how they can use it more effectively. Since this
 is a national marketing program all we need to do is make our name
 and service capabilities known in the marketplace. Once we do this
 we ought to be able to sell something. When we sit down to discuss
 this particular aspect of our business and the enormous opportunity
 it represents, I think that you will find the incentive program to
 be of great interest and potential profit.
 There is also a great deal of local business to be had if someone
 approaches the matter with a plan. There is no question that the
 
 
 21
 automobile is a convenience and not necessarily a need. However look
 at the number of two car families in our community; not to mention
 the number of homeowners. Who is providing the funds for these
 middle class working folks to acquire these goods and services? To
 the best of my knowledge no one in our industry has made a concerted
 effort to obtain large segments of this market. This is particularly
 true in the targeted area of IRA, money market, and the regular
 savings and checking business. Why can't we work up a maintenance
 and incentive program that would produce results and pay dividends
 to whoever brings in the business. We have purposely not discussed
 our newest product -- lockboxing. This product we will begin
 marketing when we have the people to do an effective selling job. We
 already handle the "back (disbursement) end" of Cash Management,
 check processing. Its a natural move to the "front (collection)
 end." We have in mind a bonus program similar to what we would work
 out in check processing.
 Marjorie, I personally feel that with your capabilities you could
 contribute significantly to the Bank and yourself in the process.
 Your title would be Assistant Vice President. We would offer a
 starting salary of $25,000.00 with an annual review. We can sit down
 and work up to an appropriate bonus program based upon specific
 performance. This would be in addition to our normal profit sharing
 in which every Bank employee participates. We have meaningful
 products to sell and we feel that all we need to do is find the
 right
 000006
 Ms. Marjorie B. Price
 February 11, 1984
 Page 3
 people to get the job done. We feel that you are someone who can
 assist us in meeting our goals and we'd like to have you join our
 team.
 I think the opportunity can be both challenging and rewarding for a
 person who wants to get involved. After you have reviewed the
 enclosed material and thought about the proposal, I would appreciate
 some indication of your level of interest.
 Yours truly,
 George R. Brokemond
 President
 GRB/bkr
 Encl:
 000007
[HCB]
HIGHLAND COMMUNITY BANK
1701 WEST 87th STREET . CHICAGO, IL 60620
MEMBER FDIC 312/681-6800
 August 13, 1984
 Ms. Marjorie B. Price
 5104 South Kimbark Avenue
 Chicago, Illinois
 60615
 Dear Marjorie:
 I am pleased that you have decided to join us. Please accept this
 letter as a modification and supplement to my letter of February 11,
 1984.
 The job carries the title of Assistant Vice President, a base salary
 of $30,000, initial two (2) week vacation, ten paid holidays, and
 six (6) paid sick days. You will report to Linda Hurley, though you
 will be expected to work independently with your assigned portfolio
 of companies. The position does require travel as necessary to
 assure market coverage. You will be eligible to participate in the
 employee profit sharing program at the end of your first
 anniversary. However the incentive program outlined in my letter
 dated February 11, 1984 goes into effect immediately. You will be
 expected to participate in local civic and social events deemed to
 be in the best interest of the Bank.
 Please prepare a list of civic, social and trade organizations in
 which you are presently active or interested; as well as a list of
 schools, meetings and seminars you would like to attend so that time
 budgeting can be worked out.
 In addition, I would like to see a business plan outlining on a time
 and event basis how you anticipate achieving the predetermined goals
 and objectives we have discussed. I would like to have these
 documents by September 15.
 If these conditions meet with your approval please so indicate by
 signing in the space below.
 Yours truly,
 /s/ George R. Brokemond
 George R. Brokemond
 President
 GRB/bkr
 TERMS AND CONDITIONS ACCEPTED
 /s/ Marjorie B Price 8/26/84 000008
 ------------------------ -----------------------
 Marjorie B Price EXHIBIT "B" Date
 
 
 
 [1]
 Highland's assets and net income were shown to be $80 million and $800,000 respectively in 1988